60 A.3d 1

**100 INVESTMENT LIMITED PARTNERSHIP, et al.**

v.

**COLUMBIA TOWN CENTER TITLE COMPANY, et al.**

**No. 19, Sept. Term, 2012.**

Court of Appeals of Maryland.

Jan. 29, 2013.

James E. Carbine (James E. Carbine, PC, Baltimore, MD), on brief, for petitioners.

Richard E. Hagerty (Troutman Sanders LLP, McLean, Virginia), on brief, for respondents.

David H. Cox, Christopher A. Glaser, Jackson & Campbell, P.C., Washington, DC, for amicus curiae brief of Maryland Land Title Association, in support of appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, BARBERA, McDONALD and DALE R. CATHELL (Retired, Specially Assigned), JJ.

GREENE, J.

This case has its roots in a real estate transaction that occurred over twenty-five years ago. In 1982, two elderly widows ("the Millers") sold a tract of land in Howard County to one party, and then, four years later, purported to sell the same tract of land to Petitioner (100 Investment Limited Partnership, or, "the Partnership"). The Partnership engaged two title companies, Cambridge Title Company ("Cambridge") and Columbia Town Center Title Company ("Columbia") (collectively, "the Title Companies," or "Respondent") to complete the title work. The Title Companies, however, failed to locate and report the Millers' first land sale. Chicago Title Insurance Company ("Chicago Title," or "Respondent") underwrote the insurance policies on the tract of land at issue. These transactions have spawned a complex line of facts and numerous lawsuits that will be detailed *infra*.

We are asked to determine whether a title company owes a duty of care, in tort, when conducting a title search. As an extension of this question, we are also asked whether a title insurance company may be held vicariously liable as a result of the Title Companies' negligent title search. In this case, we do not review a title company's or a title insurance company's contractual obligations.

We shall hold that the Title Companies owed a duty of care to their customer, the Partnership, in conducting the title search and issuing the title commitment. Additionally, we conclude that, under the circumstances, Chicago Title may not be held vicariously liable for the Title Companies' negligence.

## I.

On August 24, 1982, Francis L. Miller and Mildred C. Miller ("the Millers") conveyed a 1.144–acre tract of land in Howard County to Ahsan S. Khan, as Trustee for Ahsan S. Khan, M.D., P.A., Profit Sharing Plan ("Dr. Khan"). The deed was properly recorded among the land records for Howard County.

On October 14, 1986, however, the Millers purported to sell the same 1.144–acres of land ("the disputed tract") to the Partnership. The sale included the disputed tract as part of a larger sale of a 49.845–acre tract of land. Cambridge Title Company[1] "was engaged to do the title work"[2] for this transaction. The Partnership also hired Dewberry & Davis,

---

**1.** A title company is defined as "[a] company that examines real-estate titles for any encumbrances, claims, or other flaws, and issues title insurance," usually on behalf of the title insurance company. *Black's Law Dictionary* 299 (8th ed.2004). *See generally* Barlow Burke, *Law of Title Insurance* § 1.02[C] (3d ed. Supp.2012).

**2.** Both parties define differently the extent of the terms of the agreement between the Title Companies and the Partnership. Although the specific contract is not in the record, the parties agree that the Title Companies "were engaged to do the title work" for the two sales of the disputed tract. Additionally, as noted by the intermediate appellate court, "neither the Title Companies nor the Partnership contest the existence of a contractual relationship...." *Columbia Town Ctr. Title Co. v. 100 Inv. Ltd. P'ship*, 203 Md.App. 61, 82, 36 A.3d 985, 997 (2012).

LLC ("Dewberry") to survey the land for the potential sale. There does not appear to be any genuine dispute that Cambridge issued a title commitment[3] and later an insurance policy[4] to the Partnership underwritten by Chicago Title,[5] pursuant to an agency agreement between Cambridge and Chicago Title.[6] The commitment did not report the previous sale to Dr. Khan. Cambridge has since gone out of business.

---

3. A title commitment for title insurance, often called a title binder, "contain[s] statements that purchasers and their attorneys use as title information." James Bruce Davis, *More Than They Bargained For: Are Title Insurance Companies Liable in Tort for Undisclosed Title Defects?*, 45 Cath. U.L.Rev. 71, 76–77 (1995). The commitment is typically issued by a Title Company or a Title Insurance Company before the close of the land sale and before the insurance policy is issued. The information contained in a title commitment will be detailed at length later in this opinion.

4. Title insurance has been defined as "a risk management tool that ... protect[s] against loss caused by the state of title or the priority of a mortgage being other than as described in the policy ... [if the policy's] ... description is inaccurate and the insured suffers a loss as a result of that inaccuracy, the policy covers that loss subject to the various provisions of the policy." 5 Steven A. Freeman, et al., *Appleman on Insurance* § 54–01[1][a] (2012). The insured typically pays a premium for the title insurance policy coverage, and the price is based on the level of risk, level of coverage, and maximum payout. *See Columbia Town Ctr. Title Co.*, 203 Md.App. at 73, 36 A.3d at 992. The predominant view is that a title insurance policy serves to indemnify the insured against loss or defects, and is not a contract of guaranty or warranty. *See Stewart Title Guar. Co. v. West*, 110 Md.App. 114, 128, 676 A.2d 953, 960 (1996) (citations omitted); *see also* Md.Code (1995, 2011 Repl. Vol.), § 1–101(qq) of the Insurance Article (defining title insurance as "insurance of owners of property or other persons that have an interest in the property against loss by encumbrance, defective title, invalidity of title, or adverse claim to title").

5. A title insurance company underwrites the title insurance policy. The insurance company generally issues the policy after the commitment is issued, the closing is complete, the purchase price is paid, and the deed to the land is obtained by the purchaser. *See* Davis, *More Than They Bargained For*, 45 Cath. U.L.Rev. at 76–77.

6. The record contains the insurance policy issued by Columbia for the Partnership and underwritten by Safeco for the second transaction, but does not contain the insurance policy issued by Cambridge for the Partnership and underwritten by Chicago Title. In the trial court, however, the Partnership conceded that "[the Partnership], in the October transaction, engaged Cambridge Title Company ... to handle

On December 18, 1986, there was a transfer of ownership interests in the Partnership. The original owners transferred their ownership interest in the Partnership to Petitioners Coscan/Adler Limited Partnership (formerly "Costain/Adler Limited Partnership") and Brit–Am II Limited Partnership. Columbia "was engaged to do the title work" for the December transaction. Columbia issued a title commitment to the Partnership and later issued an insurance policy underwritten by Safeco Title Insurance Corporation ("Safeco"). Columbia failed to report the earlier sale to Dr. Khan in the commitment or the policy. After that transaction, Chicago Title acquired Safeco. As such, Chicago Title assumed Safeco's liabilities and is, therefore, responsible for Safeco title insurance policies.

In 1994, for the purpose of residential development, the Partnership subdivided the land it had purchased from the Millers, including the disputed tract. The Partnership subsequently executed and recorded a Declaration of Covenants, Easements, Charges, and Liens in connection with the residential development in Howard County. The Partnership purportedly dedicated a portion of the disputed tract as a public utility easement.

Thereafter, the Partnership purportedly conveyed to N.V.R. Homes, Inc. ("NVR") a portion of the disputed tract as part of five townhouse lots. These lots were later improved and conveyed to individual homeowners. On August 30, 1995, the Partnership purportedly conveyed the remainder of the disputed tract, as part of a larger conveyance to The Lyndwood

---

the closing, to do a title search, to get a title commitment, *and get a policy of title insurance."* (emphasis added). The intermediate appellate court also noted that "in conjunction with [the October] purchase, Cambridge issued a policy to the Partnership, underwritten by Chicago Title...." *Columbia Town Ctr. Title Co.,* 203 Md.App. at 68, 36 A.3d at 989. Like the intermediate appellate court, we will assume that the policies are substantially similar "because title insurance policies are fairly standardized throughout the industry." *Columbia Town Ctr. Title Co.,* 203 Md.App. at 100 n. 17, 36 A.3d at 1007 n. 17 (citing Davis, *More Than They Bargained For,* 45 Cath. U.L.Rev. at 77).

Association, Inc., a homeowner's association, to be used for common area open space and landscaping.

It was not until July 26, 2001, that the Partnership learned of the previous sale of the disputed tract from the Millers to Dr. Khan. The Partnership only discovered this information after Dr. Khan agreed to sell a large tract of land, including the disputed tract to 100–103 Center, LLC, and Courtyards at Timbers, LLC, (collectively, "Timbers") and Timbers hired a surveyor. The surveyor discovered townhouses located on a portion of the land that Timbers intended to purchase from Dr. Khan. Timbers contacted the Partnership and notified it of the impending sale, scheduled to take place within the week.

To cure the title defect, the Partnership offered to repurchase the disputed tract from Timbers after Timbers purchased the land from Dr. Khan. Thereafter, the Partnership repurchased the disputed tract from Timbers at the fair market value that Timbers had paid per acre to Dr. Khan, amounting to $175,348.56. The Partnership incurred additional expenses with regard to the transaction, including costs and attorneys fees bringing the total cost to $191,510.88.

On April 7, 2004, the Partnership filed a complaint in the Circuit Court for Howard County against Cambridge, Columbia, Chicago Title, Dewberry, and Francis L. Miller, the surviving grantor of the disputed tract.[7] The Partnership

---

[7]. Prior to the present action filed in the Circuit Court for Howard County, the parties instituted litigation in both state and federal courts. In 2002, Dr. Khan filed, in the District Court of Maryland, sitting in Howard County, a complaint against the Partnership for trespass. *Ahsan S. Khan v. 100 Inv. Ltd. P'ship*, Case No. 100100013442002. The District Court entered judgment in favor of Dr. Khan and awarded him nominal damages.

NVR also filed a suit against the Partnership in the Circuit Court for Howard County alleging that the Partnership conveyed defective title. *NVR, Inc. v. 100 Inv. Ltd. P'ship*, Case No. 13–C–02–052503 OC. This case was quickly resolved, however, because once the Partnership repurchased the disputed tract, the doctrine of after-acquired title retroactively cured all title defects, including the public utility easement and the deeds to NVR and Lyndwood as of the original date of the conveyances. Petitioner's Brief at 8.

alleged claims for negligence against (1) Cambridge and Columbia in performing the title search and failing to discover and report the Khan deed, (2) Dewberry for its negligent performance of the land survey, and (3) Chicago Title under a theory of vicarious liability for the Title Companies' negligent title search.[8] The Title Companies and Chicago Title responded to the complaint and filed a motion for summary judgment. They alleged collateral estoppel, claiming that the action was barred because the factual issues had been resolved in the Fourth Circuit, and that the Partnership could not prove that its damages were proximately caused by the Title Companies'

On April 5, 2002, Chicago Title filed suit against the Partnership, in the United States District Court for the District of Maryland, seeking declaratory judgment. *Chicago Title Ins. Co. v. 100 Inv. Ltd. P'ship*, No. JFM–02–CV1138 (D.Md.2002). In its complaint, Chicago Title asked the court to determine its responsibilities under the insurance policy issued in December, 1986, with respect to the Partnership's repurchase of the disputed tract. The federal district trial court granted summary judgment in favor of the Partnership, awarding it $201,744.37 in damages for its repurchase of the disputed tract and for the costs associated with the Khan litigation.

Chicago Title appealed that judgment to the United States Court of Appeals for the Fourth Circuit. The federal appellate court, in *Chicago Title Ins. Co. v. 100 Inv. Ltd. P'ship*, 355 F.3d 759 (4th Cir.2004), affirmed in part and reversed in part the judgment of the federal trial court. The Fourth Circuit reversed the determination that Chicago Title owed damages and attorneys fees to the Partnership for repurchasing the parcel. *Chicago Title Ins. Co.*, 355 F.3d at 761. The Fourth Circuit explained that once the Partnership conveyed the land, Chicago Title was no longer contractually liable to it. *Chicago Title Ins. Co.*, 355 F.3d at 765. The Fourth Circuit affirmed the trial court's judgment with regard to defending and paying damages for the trespass action because even though the trespass action occurred after the policy period, the damage was sustained during the policy period. *Chicago Title Ins. Co.*, 355 F.3d at 765–66.

*Res judicata* does not bar the present suit because the negligence claim was dismissed without prejudice prior to final judgment in the Federal Court. *Cf. 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, Sept. Term 2005, No. 2214 (Md.Ct.Spec.App. Mar. 8, 2007) (noting that "[the Title Companies] appropriately do not contend that the doctrine of *res judicata* applies ..."). Collateral estoppel was alleged in the state court proceedings and will be discussed, *infra*.

**8.** The Partnership later submitted an amended complaint that added a breach of contract claim against Columbia. The amended complaint also contained the original negligence claim against Cambridge.

negligent title search. The trial court granted summary judgment in favor of the Title Companies and Chicago Title,[9] concluding that collateral estoppel barred the action and that the Partnership could not show that its damages were proximately caused by the Title Companies' search.

The Partnership appealed to the Court of Special Appeals. The intermediate appellate court, in an unreported opinion, reversed the trial court's determinations and remanded the case to the trial court to determine factually whether any negligence by the Title Companies was the proximate cause of the Partnership's damages. The intermediate appellate court held that the action was not barred by collateral estoppel because the federal litigation sounded in contract and dealt with the title policy and the extent of its coverage, whereas the present complaint sounded in tort.

After remand, a bench trial was held in the Circuit Court for Howard County, and on May 11, 2009, the court issued a memorandum opinion, ruling in favor of the Partnership. The court determined that the Title Companies were engaged "to perform all the duties expected of a title company in connection with the purchase of land in a commercial real estate transaction." This undertaking required that the title examiner use "a reasonable degree of skill and diligence [in examining title]." *Corcoran v. Abstract & Title Co. of Md., Inc.,* 217 Md. 633, 637, 143 A.2d 808, 810 (1958). Based on the evidence adduced at trial, the court found that the Title Companies breached this duty. Furthermore, the court maintained that the Title Companies "would have known" that the Partnership would rely on their title search. According to the trial judge, the negligent title search was a proximate cause of the Partnership's losses. As such, the court determined that the Title

---

9. According to the parties, the suit against Dewberry was dismissed after facts uncovered during discovery indicated that Dewberry did not breach its standard of care. Furthermore, the trial court entered judgment against Francis L. Miller in favor of the Partnership with regard to the covenants of warranty included in her deed to the Partnership. *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.,* Case No. 13–C–04–058302 OC.

Companies were liable in tort to the Partnership. Additionally, the court held that Chicago Title was vicariously liable for the Title Companies' negligence under the doctrine of *respondeat superior* because Chicago Title "exerted a lot of control over its local agents," as gleaned from the parties' contracts and testimony in the trial court proceedings. The trial court awarded the Partnership $191,510.88.

The Title Companies and Chicago Title appealed to the Court of Special Appeals. The intermediate appellate court held that the Title Companies owed no duty in tort to the Partnership on the basis of the title search. *Columbia Town Ctr. Title Co. v. 100 Inv. Ltd. P'ship*, 203 Md.App. 61, 82, 36 A.3d 985, 997 (2012). In reaching this result, the court emphasized that the General Assembly has neither imposed nor given any indication of an intent to impose a tort duty on title companies. *Columbia Town Ctr. Title Co.*, 203 Md.App. at 83–86, 36 A.3d at 998–1000. The court also distinguished the role of a title searcher from other professionals, such as attorneys, who have been found to owe a duty in tort, concluding that title searchers' licensing requirements do not focus on "ensuring proficiency in the search and examination of title," and that their work does not require professional judgment to the same extent as attorneys and other professionals. *Id.*

Furthermore, the court held that Chicago Title could not be vicariously liable in tort for the Title Companies' negligence given the insurance company's role as an indemnifier, not a guarantor, of title. *Columbia Town Ctr. Title Co.*, 203 Md. App. at 91, 103, 36 A.3d at 1002–03, 1009–10. The court explained that if a title insurance company could be liable in tort, it would be deprived of its option to cure or pay for covered losses as specified in the insurance policy. *Columbia Town Ctr. Title Co.*, 203 Md.App. at 91, 36 A.3d at 1002. The court noted that the scope of Chicago Title's agency relationship with the Title Companies did not extend to undertaking a title search for the benefit of the insured. *Columbia Town Ctr. Title Co.*, 203 Md.App. at 98–99, 36 A.3d at 1006–07. In addition, the court reasoned that the insurance policy between Chicago Title and the Partnership contained a limited liability

provision that restricted any action against the insurance company in negligence to the insurance contract. *Columbia Town Ctr. Title Co.,* 203 Md.App. at 102, 36 A.3d at 1009.

In a dissenting opinion authored by Judge Meredith, he concluded that the Title Companies owed a duty in tort to the Partnership. *Columbia Town Ctr. Title Co.,* 203 Md.App. at 104, 36 A.3d at 1010 (Meredith, J., dissenting). Judge Meredith explained that "[w]hen a contract purchaser of real property engages a title company to conduct settlement on the contract ... the typical purchaser of real estate expects, at a minimum, that the title company will (1) confirm that the seller holds good and marketable title, and (2) prepare a deed that transfers good and marketable title to the purchaser." *Id.* The purchaser relies on this information to decide whether to go to closing. *Id.* According to the dissent, Maryland law provides that a claim against a title company may be asserted in negligence. *Columbia Town Ctr. Title Co.,* 203 Md.App. at 105, 36 A.3d at 1010. To support this conclusion, Judge Meredith compared the role of the title searcher to that of professionals who have been found to owe a duty in tort. *Columbia Town Ctr. Title Co.,* 203 Md.App. at 105–07, 36 A.3d at 1010–12.

Subsequently, the Partnership asked that we review the case. We granted *certiorari* in *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.,* 426 Md. 427, 44 A.3d 421 (2012), to answer the following questions:

1. Did the Court of Special Appeals err by holding that the principles of *Jacques v. First National Bank of Maryland,* 307 Md. 527, 515 A.2d 756 (1986) did not apply to title companies in general and therefore that the Title Companies did not owe a tort duty of care to the Partnership in conducting a title search for the benefit of the Partnership?

2. Did the Court of Special Appeals err by holding that Chicago Title was not vicariously liable for the negligence of the Title Companies, who were its agents?

## II.

The issue before us is whether there was a duty imposed on the Title Companies in tort. We are asked first to discern, therefore, whether a title company may owe a tort duty of care for a title search, and whether the Title Companies in the present case owed a duty of reasonable care to the Partnership in conducting a title search.

Whether a legal duty exists between parties is a question of law to be decided by the court. *See Pace v. State,* 425 Md. 145, 154, 38 A.3d 418, 423 (2012) (citing *Valentine v. On Target, Inc.,* 353 Md. 544, 549, 727 A.2d 947, 949 (1999)). We review the trial court's legal determinations for legal correctness. *See Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2002) (citations omitted) ("[O]ur Court must determine whether the lower court's conclusions are 'legally correct' . . . .").

The Partnership contends that the Title Companies owed a duty to exercise reasonable care in searching the title to the property conveyed by the Millers to the Partnership. Further, the Partnership maintains that under *Jacques v. First Nat'l Bank of Md.,* 307 Md. 527, 515 A.2d 756, 760 (1986) and its progeny, a tort duty of care arises independently as a matter of public policy, and in economic loss cases, a duty is imposed when there is an "intimate nexus" between the parties. In other words, according to the Partnership, because it engaged the Title Companies to conduct a title search, which "went to the core of the[ir] relationship," and it was foreseeable to the Title Companies that the Partnership would rely on the accuracy of the title search to close on the land contract, the relationship was such that the parties shared an "intimate nexus." The Partnership also highlights the importance of the information supplied by title companies to their customers, comparing the title examiner's work to that of doctors, lawyers, accountants, architects, and other professionals that have been found to owe a duty in tort.

In response, the Title Companies contend that the relationship between the Title Companies and the Partnership was

contractual in nature, and, as such, a tort duty should not be imposed. Furthermore, according to the Title Companies, the relationship between the parties was limited in nature; the Partnership contracted with the Title Companies to issue title binders and title insurance policies, not to provide title opinions. This limited relationship, the Title Companies maintain, cannot be construed as an "intimate nexus" to warrant tort liability, as there was no expectation or reliance on behalf of the Partnership on the information contained in the title commitments or policies. The Title Companies also argue that public policy does not warrant a tort duty of care. For example, the legislature has yet to establish liability, in tort, for title companies. Additionally, the Title Companies contrast their duties with those of industry professionals where this Court has established an additional tort duty of care. *See Jacques,* 307 Md. at 541, 515 A.2d at 763 (citations omitted) (noting that the "law generally recognizes a tort duty of care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants ... [and] we have recognized that in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill").

"It is a settled and 'familiar proposition that not every duty assumed by contract will sustain an action sounding in tort.' " *Mesmer v. Md. Auto. Ins. Fund,* 353 Md. 241, 252, 725 A.2d 1053, 1058 (1999) (citing *Council of Co–Owners Atlantis Condo., Inc. v. Whiting–Turner Contracting Co.,* 308 Md. 18, 32, 517 A.2d 336, 343 (1986)); *see also U.S. Gypsum Co. v. Mayor of Balt.,* 336 Md. 145, 156, 647 A.2d 405, 410 (1994); *Decoster v. Westinghouse Elec. Corp.,* 333 Md. 245, 250–51, 634 A.2d 1330, 1332–33 (1994) (citations omitted); *Jacques,* 307 Md. at 534, 515 A.2d at 759. There are situations, however, when responsibilities imposed by a contractual relationship are supplemented with tort duties. *See Jacques,* 307 Md. at 534, 515 A.2d at 759 (citing *Slacum v. Trust Co.,* 163 Md. 350, 352–53, 163 A. 119, 120 (1932)). Our law is well-established that to assert a claim in negligence, the plaintiff

must prove: "(1) *that the defendant was under a duty to protect the plaintiff from injury,* (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 131–32, 916 A.2d 257, 270–71 (2007) (emphasis added) (quoting *Valentine,* 353 Md. at 549, 727 A.2d at 949).

■■ We have adopted Prosser and Keeton's characterization of "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward one another." *See Blondell v. Littlepage,* 413 Md. 96, 120, 991 A.2d 80, 94 (2010) (quoting W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 53 (5th ed.1984)). Thus, in determining whether "an actionable duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Blondell,* 413 Md. at 120, 991 A.2d at 94; *see also Pendleton v. State,* 398 Md. 447, 461, 921 A.2d 196, 204–05 (2007) (citations omitted).

■■ In Maryland, to impose a tort duty on title examiners is not a novel idea. We have recognized that "[o]ne who undertakes to examine a title for compensation is bound to exercise a reasonable degree of skill and diligence in the conduct of the transaction." *Corcoran v. Abstract & Title Co. of Md., Inc.,* 217 Md. 633, 637, 143 A.2d 808, 810 (1958). We explained that although liability for a faulty title search in reality rests upon the contractual relationship between the title searcher and the customer, it is also "ordinarily enforced by an action ... for negligence in the discharge of [the title examiner's] professional duties...." *Corcoran,* 217 Md. at 637, 143 A.2d at 810 (citing *Watson v. Calvert Bldg. Ass'n,* 91 Md. 25, 33, 45 A. 879, 881 (1900)); *accord Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 335–36, 624 A.2d 496, 499–500 (1993).

■ To determine whether a tort duty exists in a particular context, we examine: (1) "the nature of the harm likely to result from a failure to exercise due care," and (2) "the

relationship that exists between the parties." *Jacques,* 307 Md. at 534, 515 A.2d at 759. As we explained further in *Jacques:*

> Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.

*Jacques,* 307 Md. at 534–35, 515 A.2d at 759–60 (citations omitted).

We have, on numerous occasions, considered when an "intimate nexus" is present between parties such that a duty in tort exists in a case of economic injury. *See Blondell,* 413 Md. at 122, 991 A.2d at 95 (discussing whether an intimate nexus existed between two attorneys to support the existence of a duty to warrant economic damages); *Chicago Title Ins. Co. v. Allfirst Bank,* 394 Md. 270, 296, 905 A.2d 366, 381 (2006) (analyzing whether an intimate nexus existed between a bank and a non-customer drawer of a check in a tort action where only economic loss resulted); *Jacques,* 307 Md. at 534–35, 515 A.2d at 759–60 (1986) (assessing whether an intimate nexus existed between a bank and its customer).

In *Jacques,* we were asked to determine whether a bank that undertook to process and make a determination on a loan application owed its customer a duty of care in the processing of the application. *Jacques,* 307 Md. at 528, 515 A.2d at 756. We highlighted two cases from the Court of Appeals of New York to delineate the line between relationships that do and do not warrant tort liability when damages are economic. The first case cited was *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), a case where the plaintiff, a bean consumer, sued a defendant bean weigher for negligent bean weighing. The contractual relationship, however, was between the bean weigher and a third party seller of beans. Judge Cardozo,

writing for the Court, held that as the buyer was the known and intended beneficiary of the agreement, the weigher was on notice that the buyer would rely on the information the weigher provided, namely, the bean weight, in completing his purchase. Furthermore, because the reliance on the information supplied by the bean weigher was the end aim of the transaction (and the inducement to purchase), there was a close enough relationship between parties to hold the bean weigher liable in tort to the buyer. *Glanzer*, 135 N.E. at 275–77.

We contrasted *Glanzer* with *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), where the Court of Appeals of New York refused to find liability in tort because the relationship between a negligent accountant and a third party relying on the balance sheet prepared by the accountant for a corporation was too attenuated. The *Ultramares* court stressed that because the third party was part of an "indeterminate class of persons," there was no privity or close enough relationship to hold the accountant liable for negligence to the third party. *Ultramares*, 174 N.E. at 445–47.

The *Jacques* Court then applied a similar relationship analysis to its facts. The Court noted that when the bank agreed to process and make a determination on the loan application, the Bank knew that the customer was "particularly vulnerable and dependent upon the Bank's exercise of due care[,]" as the bank was aware that the customer would be obligated to forfeit its housing deposit or proceed to settlement with the loan in light of the bank's determination. *Jacques*, 307 Md. at 540–41, 515 A.2d at 762–63. Therefore, the bank had a duty to process the application with reasonable care given the bank's relationship with its customer and the bank's knowledge of the customer's reliance on the bank's services.

The *Jacques* Court also considered an additional factor relevant to the determination of whether to recognize a tort duty: the "nature of the business of the party upon whom the burden is sought to be imposed." *Jacques*, 307 Md. at 541, 515 A.2d at 763. We explained:

The law generally recognizes a tort duty of care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants. Additionally, we have recognized that in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill.

*Jacques*, 307 Md. at 541, 515 A.2d at 763 (citations omitted). As banks have traditionally "been held to a high degree of integrity and responsiveness to their public calling[,]" we held that the plaintiff must show that the defendant "failed to exercise that degree of care which a reasonably prudent bank would have exercised under the same or similar circumstances." *Jacques*, 307 Md. at 541–44, 515 A.2d at 763–64.[10]

We were again asked whether privity or its equivalent existed between parties to warrant tort liability in *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 762 A.2d 582 (2000). In *Walpert*, an accounting firm contracted with a business to prepare a financial report. The firm prepared the report in a negligent manner and a third party relied on the report, suffering economic damages. The Court discussed the variety of approaches to finding duty or lack thereof. *Walpert*, 361 Md. at 657–92, 762 A.2d at 588–607. In applying the privity standard enunciated in *Jacques* and *Ultramares*, the Court looked for an intimate nexus between the parties.[11]

---

**10.** We further noted that, "[a]s in any other negligence case, an industry standard, if it exists, may be proven as evidence of the applicable standard of care." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 544, 515 A.2d 756, 764 (1986).

**11.** We also discussed *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110, 118 (1985), a case decided by the Court of Appeals of New York. We explained that *Credit Alliance* "clarified the ambiguity surrounding the nature of the relationship between the plaintiff and the defendant sufficient to constitute the required nexus that approaches privity...." *Walpert, Smullian, & Blumenthal, P.A. v. Katz*, 361 Md. 645, 690, 762 A.2d 582, 606 (2000). *Credit Alliance*, which also dealt with imposing tort liability on accountants, noted that the plaintiff must show that "(1) the accountants must have been aware that the financial reports [they prepared] were to be

Focusing on the accountant's knowledge of the third party's reliance on the accountant's report, we concluded that the accountant's knowledge could suffice as the legal equivalent of privity necessary to establish a negligence claim between the parties.[12] *Walpert,* 361 Md. at 684–88, 692–94, 762 A.2d at 603–05, 607–09.

The Court of Special Appeals has also analyzed when an "intimate nexus" might exist between parties. *See Champion Billiards Cafe, Inc. v. Hall,* 112 Md.App. 560, 569–71, 685 A.2d 901, 906 (1996) (noting the existence of an "intimate nexus" between employer and employee, and that the service offered by employer to forward an insurance application and withhold premiums was "a type of service ordinarily provided to an employee by an employer," that the employer undertook the task knowing that the employee relied on the employer to do so, and that the "failure to forward the application would result in a lack of coverage")[13]; *Chew v. Meyer,* 72 Md.App.

---

used for a particular purpose or purposes; (2) in the furtherance of which a known party ... was intended to rely; and (3) there must have been some conduct on the part of the accountants ... which evinces the accountants' understanding of that party['s] ... reliance." *Credit Alliance,* 493 N.Y.S.2d 435, 483 N.E.2d at 118.

**12.** The *Walpert* Court applied the *Credit Alliance* analysis to hold that a reasonable jury could find that the accounting firm had knowledge that the third party relied on its financial report. First, there was evidence that the accounting firm was aware the report would be used for a particular purpose, i.e., to help the third party decide whether to make a loan. Second, there was evidence that the accounting firm knew that the third party would rely on the report because the third party informed the accounting representative of that fact. Finally, the "linking conduct" included a meeting between the parties, and a copy of the financial report, prepared to allow the third party to determine whether to make a business decision in reliance on the accounting firm's report. *Walpert,* 361 Md. at 694, 762 A.2d at 608–09.

**13.** With regard to finding privity between parties, the intermediate appellate court has explained that

[i]f the intimate nexus exists through contractual privity or its equivalent, whether the activity undertaken is part of a contractual obligation, express or implied in fact, or is undertaken gratuitously, the activity must be closely connected with and arise out of the nexus between the parties. In addition, to impose a tort duty, there must be

132, 141–42, 527 A.2d 828, 832–33 (1987) (highlighting the "intimate nexus" between a doctor and his patient to support a tort claim for negligent handling of an insurance form based on the parties' contractual relationship, the patient's reliance, the risk of harm, and the doctor's knowledge of both the reliance and the risk).

We explained in *Walpert* that "the rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct . . . resulting in economic damages . . . [is] to avoid 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.' " *Walpert,* 361 Md. at 671, 762 A.2d at 596 (quoting *Ultramares,* 174 N.E. at 444). A defendant can protect itself from such unpredictable and unlimited liability in cases where there is a close nexus between the parties. Such a relationship might stem from a defendant's knowledge of the plaintiff's identity, the class in which a plaintiff belongs, and the defendant's knowledge that the prospective plaintiff may be relying on the information provided by a defendant. *Walpert,* 361 Md. at 671, 687, 762 A.2d at 596, 605 (citing *Glanzer,* 135 N.E. at 275–76).

This rationale helps explain why we did not find tort liability in *Blondell v. Littlepage,* 413 Md. at 101, 991 A.2d at 83. In *Blondell,* we considered whether an attorney, William Blondell, could sue another attorney, Diane Littlepage, for negligent consultation, communication, and disclosure, even though there was a shared fee agreement between the parties governing the duties owed one another. We held that any duty owed by Littlepage to Blondell was "circumscribed by the fee sharing agreement," which "directly contradict[ed] the existence of th[e] duties." *Blondell,* 413 Md. at 122–23, 991 A.2d at 96. Through the fee sharing agreement, Blondell "had conceded at the inception any necessity of consultation and its

---

reasonable reliance by the aggrieved party, a risk of loss, and knowledge by the defendant of both the reliance and the risk of loss. *Champion Billiards Cafe, Inc. v. Hall,* 112 Md.App. 560, 570–71, 685 A.2d 901, 906 (1996).

attendant communication between him and Littlepage." *Id.* This, therefore, is a situation where the defendant excluded itself from liability such that the plaintiff was on notice not to rely on the defendant. The expectation by the parties involved, therefore, was essentially that no duty was owed. This case differs from the others where privity and an "intimate nexus" was found as a result of the expectation and knowledge of reliance by the plaintiff.

In the instant case, we concern ourselves with whether there existed an "intimate nexus" between the Partnership and the Title Companies to warrant a duty to exercise due care in conducting the title search. We examine the relationship between the parties, to see if there is contractual privity or its equivalent.

Although the parties disagree as to the nature and scope of their relationship, the Title Companies and the Partnership agree that the Title Companies were engaged to do the "title work" for the two land sales. Part of the title work included the issuance of the title binders by the title company on behalf of the insurance company to the prospective buyer before closing. These title binders were issued as part of the title commitment.

According to Michael Schleupner, who testified during a deposition as Chicago Title's corporate designee, a title commitment is issued by the title agent, and is

also known as a binder ... used in the personalized insurance business ... issued prior to the closing and it says if a closing takes place, if money is to be lent by a lender, if the consideration of the purchase of a property is to be offered to the right parties[,] [the insurance company] stand[s] ready, willing and able to ensure the title under the following circumstances and it's divided into three parts.

There's Schedule A, Schedule B–1, and Schedule B–2. Schedule A says who the potential insured will be and identifies who is currently in title. It lists the amount of the policy to be issued. It describes the property to be insured.

Schedule B–1 [lists] requirements ... if there are existing liens on the property the requirements would be they have to be paid. If there are taxes on the property that are open taxes they have to be paid. It also identifies the instruments that have to be recorded for the company to insure the title as set forth in Schedule A. . . .

Schedule B–2 contains those exceptions to title both pre-printed ... generally survey matters and things and also those discovered in the course of examining the title or the land records, you know, pole line agreements, easements, restrictions, covenants and things of that sort, matters set forth on recorded subdivision plats.

Basically the company is committing itself to ensure ... this title for this amount of money if you pay us a premium of[ ] X but our policy will contain exceptions to coverage A, B, C, D, E, F, G.

The significance of the information contained in the title commitment was described by Petitioner's expert witness John Llewellyn during trial. He explained that after the title search is completed, the commitment is prepared. Thereafter,

the title commitment is basically the—is the title report that's the face to the clients involved, to—[ ] the purchaser of the property, would get a copy of the title commitment to review. . . .

[N]either the purchasers of the property or the sellers or the—any lenders involved are going to see the raw title abstract. The only thing they're going to see—the only thing they're going to know is what's on the title commitment that ... what the status of the title is.

[T]he purchaser would examine the title commitment to see ... there's many things . . . . who is the owner of the property ... the legal description of the property ... a metes and bounds description [of the property.]

... the things that would have to be done in order for a closing to even take place. . . .

There would also be in there what things have to be in order—in order to have marketable title transfer ... routine things ... like releases or mortgages or deeds of trust

... that affect the property ... [and][t]he exceptions ... that affect the property presently.

Furthermore, Mr. Llewellyn stated that "the most important aspect of what a title settlement company does is to make sure that good title is passing, fee simple in this case, marketable, insurable title is passing to the buyer. That's their main function in handling the closing, and the most important function."

Gregory Reed, the Partnership's attorney in the December transaction also testified during a deposition as to the significance of the title binder to the purchaser. He explained that the title binder is "extremely important ... you're buying not dirt and bricks you're buying a bundle of legal rights and the title binder is what gives you a snapshot of what those rights are supposed to be ... [t]hat you have free title and that the title is not encumbered in a way that's not satisfactory to you."

In the present case, the record contains a copy of the Title Commitment issued to the Partnership by Cambridge on behalf of Chicago Title for the October transaction, and the Title Commitment issued by Columbia on behalf of Safeco for the December transaction. For the October transaction, Schedule A states that "[t]he estate or interest in the land described or referred to in this Commitment and covered herein is [in] fee simple, and title thereto is at the effective date hereof vested in: [the Millers], as tenants in common." Schedule B lists the title requirements and exceptions, and includes specific right of way easements and agreements, from a title search. The detailed description of the land is also included as shown according to the survey conducted by Dewberry. The Commitment did not disclose the basic fact that the Millers had already sold some of the land to another party, and could not sell the same land to the Partnership. The record also contains a deed written by Cambridge, by which the Millers purportedly conveyed to the Partnership the disputed tract of land as part of a larger sale, even though the Millers did not own the disputed tract at that time.

Similarly, the December commitment lists the Partnership as owner of the land in fee simple, describes, in detail, the

exceptions in Schedule B–1, and includes the title requirements and a description of the land.[14] The December commitment incorrectly lists the Partnership as the owner of the entirety of the parcel, when, in actuality, the Partnership never owned the disputed tract and thus never had ownership rights to sell that land.

In the situation where there is only an economic injury, as in the present case, we note that to impose tort liability under the standard discussed in *Walpert,* the Partnership would have to establish: "(1) [that] the [Title Companies] must have been aware that the [title search information] w[as] to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the [Title Companies] linking [them] to that party or parties, which evinces the [Title Companies'] understanding of that party or parties' reliance." *See Walpert,* 361 Md. at 674, 690, 692–94, 762 A.2d at 597–98, 606, 607–09 (citing *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110, 118 (1985)). "Nothing in [this] test ... prescribes that the conduct exceed a minimum level ... [n]or [is there] ... a requirement that the [Title Companies] either directly convey[ed] the [title report] to the [ ] party or otherwise act[ed] in some manner specifically calculated to induce reliance on the [title report]." *Walpert,* 361 Md. at 692, 762 A.2d at 608 (citations and quotations omitted). Based on the record and the evidence adduced at trial, the record supports the conclusion that there was a sufficient intimate nexus between the Title Companies and the Partnership to establish a duty owed by the Title Companies to the Partnership. As such, the trier of fact was not clearly erroneous in making this conclusion.[15] When the Title Companies were engaged to issue title

14. The record also contains a HUD–1 settlement statement for the December transaction.

15. In a case involving economic injury, the "foreseeability approach" is not the standard used for finding a duty in tort. *See Walpert,* 361 Md.

commitments to the Partnership, the Partnership expected the Title Companies to conduct a title search exercising reasonable care and skill, and to record the results of such a search in the commitments issued to the Partnership. Furthermore, the Partnership looked to the title commitments and the information detailed by them to discern that the seller had good and marketable title to the land. The Partnership would have then relied on the information obtained by the Title Companies in its title search and as stated in the title commitment to help decide whether it would purchase the land.

The intimate nexus in the present case stems from the relationship between the Title Companies and the Partnership. First, contractual privity is easily established as both parties agree that the Partnership engaged the Title Companies to perform "title work" with regard to the land that included the disputed tract. The Title Companies also undertook to issue title insurance commitments and title insurance policies underwritten by Chicago Title for the Partnership. Although a full recitation of the details of the contract are not known, from the information contained in the title commitment it is evident that the Title Companies took it upon themselves to perform a title search, and identify that search in the title commitments issued to the Partnership. These commitments contained detailed information applicable to the sale of the land and offered in furtherance of the sale of the land. There was sufficient evidence that the title commitments induced the Partnership, or, at the very least, facilitated the Partnership's closing of the land transaction. As the title information contained in the title commitment was what the purchaser

---

at 679–692, 762 A.2d at 600–607 (noting that the foreseeability approach is an "expansive view" of liability, adopted by only a few states, and then rejecting that approach in favor of the "privity" standard). The trier of fact in the present case discussed the concept of foreseeability in the context of the duty of care owed by the Title Companies to the Partnership. It is clear, however, that the trial judge found that the Title Companies were aware that the Partnership would rely on the title search. The trial judge specifically found that "[i]t was certainly foreseeable that the Title Companies would have known that the Partnership would rely on their title search."

used to assess the status of the title, the Title Companies knew that the Partnership would rely on this information to make the purchasing decision. *See Walpert,* 361 Md. at 684, 762 A.2d at 603 (discussing *Glanzer,* which "recognize[d] that a defendant's knowledge of a third party's reliance on the defendant's action may be important in the determination of whether that defendant owes that party a duty of care").

In the instant case, the Title Companies knew that the Partnership would rely on the title commitment. The commitment, prepared by the Title Companies, specifically detailed the kind of information found in a title search, including a description of the owners, what the owners' interests in the property were, and defects in title. Such information is relied upon in making decisions as to whether to proceed to closing. In *Glanzer,* the Court of Appeals of New York explained that the "plaintiffs' use of the [weight] certificates was not an indirect or collateral consequence of the action of the weighers. It was a consequence which, to the weighers' knowledge, was the end and aim of the transaction." *Glanzer,* 135 N.E. at 275–76. Similarly here, the Partnership's reliance on the information in the commitment, supplied by the Title Companies to use in considering whether to proceed to closing, was not an indirect consequence of the Title Companies' issuance of a commitment; it was an aim of the title insurance transaction. By supplying information normally adduced in a title search and placing that information in a preliminary title report before closing, the Title Companies were on notice that the Partnership would use that information to assess the ownership rights it would acquire.

As we stated in *Chicago Title Ins. Co. v. Allfirst Bank,* "[u]nlike the facts of *Ultramares,* our holding does not impose liability on [the defendant] to an indeterminate class of people for an indeterminate time, but rather, addresses a specific entity . . . ." *Chicago Title Ins. Co.,* 394 Md. at 299–300, 905 A.2d at 383. Here, it was the Partnership that engaged both Title Companies to do title work to facilitate the purchase of a specific tract of land. The Title Companies procured the search and supplied this information in the title commitment

for the benefit of the Partnership on behalf of the insurance provider for the purposes of the future sale of land.

 Given the relationship of the parties in the present case, the significance of the title search, the details outlined in the preliminary title commitment report, and the fact that an insured looks to the title commitment for the purpose of making business decisions, we conclude that the Title Companies, under the circumstances, had a duty to exercise reasonable care in conducting the preliminary title search and transmitting that information to its customer. We recognize that this duty applies to the customer, and may extend to other parties in contractual privity or its equivalent with the title company who rely on the search for that particular contractual undertaking.[16] The duty is to employ reasonable care. The duty is not to act as guarantor. *Cf. Bank of Cal., N.A. v. First Am. Title Ins. Co.*, 826 P.2d 1126, 1129 & n5 (Alaska 1992) (finding a duty of reasonable care with regard to information contained in a title commitment). Thus, we conclude that, given the relationship of the parties in this case, it is appropriate to apply the tort negligence standard to those individuals or entities who examine title for compensation as discussed in *Corcoran*, 217 Md. 633, 637, 143 A.2d 808, 810 (1958). The duty undertaken by the title examiner is to exercise a reasonable degree of skill and diligence in the conduct of the transaction. *Corcoran*, 217 Md. at 637, 143 A.2d at 810.

---

**16.** Those in contractual privity or its equivalent with the title company for that particular transaction might include a lending bank or property seller or buyer, for example, who the title company knows will rely on that particular search between the title company and the customer. *See* Joyce Dickey Palomar, *Title Insurance Companies' Liability for Failure to Search Title and Disclose Record Title*, 20 Creighton L.Rev. 455, 461, 480–81 (1986) (explaining that title insurance purchasers are usually property sellers "who have agreed to provide a title insurance ... policy for the buyer," property buyers insuring themselves against loss, or property buyers who are required to provide their lenders a title policy insuring against loss, and that title commitments are "normally relied upon by insureds, escrow agents, and lenders with full knowledge, and sometimes with the encouragement, of the insurance company").

Other states have also looked to the title commitment, and the title company's (or the title insurance company's) awareness that clients and known purchasers rely on the information supplied in the title commitment to support tort liability. In *Bank of Cal., N.A. v. First Am. Title Ins. Co.*, 826 P.2d 1126, 1129 (Alaska 1992), the Supreme Court of Alaska held that there may be tort liability for negligent information supplied in a preliminary title commitment. The Court explained that the information in the commitment is relied upon, and is intended to be relied upon, by the title insurance companies. Had the commitment been merely intended to inform the insured of the proposed terms, the Court explained, it would have been presented together with the insurance policy, similar to most other types of insurance. *Id.* (citations omitted). Rather, the Court highlighted, the commitment is issued prior to the real property closing.[17] The Court explained that "such commitments provide an essential service to prospective buyers and lenders. They are told what transactions must take place before they can receive clear title or [ ] effective security." *Id.* Furthermore, the title insurance company (or title company) has "full knowledge" that the title information provided in the commitment is "normally relied on" by the insured.[18] *Id. See also Malinak v. Safeco Title Ins. Co. of Idaho*, 203 Mont. 69, 661 P.2d 12, 15–16 (1983) (finding a duty based on the commitment, especially when there is reliance, and explaining that "[t]he person who seeks a title insurance commitment expects to obtain a professional title search, as well as a professional legal opinion as to the

---

17. The Court noted that by issuing the commitment before the closing of the land contract, the commitment arrives at the "same stage in the transaction as [ ] the abstract or attorney's opinion ... and the [title] company should know that it will likely be used in the same manner." *Bank of Cal. N.A. v. First Am. Title Ins. Co.*, 826 P.2d 1126, 1129 (Alaska 1992) (citations omitted).

18. It should be noted that while the *Bank of California* Court emphasized its finding of tort liability through the duty assumed by title examiners in providing the title insurance commitment, it also noted an "additional factor" that a provision in the Alaska Code would have also imposed tort liability. *Bank of Cal.*, 826 P.2d at 1130.

condition of the title and a guaranty that the title expressed in the commitment will be insured to the extent of the policy coverage").

Those states that find no tort liability for a negligent title search emphasize the insurance function of the title policy alone. *See Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho,* 115 Idaho 56, 764 P.2d 423, 425–26 (1988) (explaining that the title insurance contracts and policies are "the source of the duties between the parties, not negligence principles"); *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.,* 116 N.J. 517, 562 A.2d 208, 220 (1989) (establishing the title policy as the principal source for liability); *see also* James Bruce Davis, *More Than They Bargained For: Are Title Companies Liable in Tort for Undisclosed Title Defects?,* 45 Cath. U.L.Rev. 71, 75–78, 90 (1995) (citations omitted) (noting the split in authority, and stating that courts finding tort liability view the issuance of the commitment and policy as the undertaking of a duty to supply the insured with title information, whereas courts that find tort principles inapplicable stress that the policy is the "source and measure of the company's liability").

In the context of holding professionals liable not only in contract but also in tort, this Court has considered alternative approaches to establishing tort liability. *See Walpert,* 361 Md. at 676–80, 762 A.2d at 599–601 (2000) (acknowledging and discussing at length the additional approaches used in finding a duty, besides privity). These duties are frequently related to the "public calling" of the professional. As we explained in *Jacques,* 307 Md. at 541, 515 A.2d at 763 (citations omitted):

An additional factor relevant to the determination of whether to recognize the existence of a tort duty is the nature of the business of the party upon whom the burden is sought to be imposed. Judge Cardozo commented on the "public calling" of the defendants in *Glanzer v. Shepard* and [*Ultramares* ]. The law generally recognizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects and public accountants. Additionally, we have recognized that in those occupations requiring peculiar skill, a tort duty to act with

reasonable care will be imposed on those who hold themselves out as possessing the requisite skill.[19]

Judge Meredith, in his dissent in this case, discussed the special theories of liability in tort that apply to professionals. *Columbia Town Ctr. Title Co.*, 203 Md.App. at 105–07, 36 A.3d at 1011 (Meredith, J., dissenting). That analysis is instructive in the present case with regard to title companies. Similar to Judge Meredith, we recognize Professors Dobbs, Hayden, and Bublick's treatise on torts, noting that "even states which limit tort actions for negligent performance of a contract generally permit recovery in tort for economic losses caused by the negligent services of a professional." *Columbia Town Ctr. Title Co.*, 203 Md.App. at 105, 36 A.3d at 1011 (Meredith, J., dissenting) (citing 3 Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 615 at 494–95 (2d ed.2011)). The treatise states:

> *Actions for certain negligent services permitted; attorneys and "professionals."* Application of the economic loss rule to services seems consistent with the policy behind the rule, but it opens up a new problem. Courts continue to permit negligence actions by clients against such service providers as attorneys, accountants, insurance brokers, notaries and [sic] sometimes even title insurers who perform a negligent title search. On the one hand, the economic loss rule often protects other providers of services, such as building contractors, against liability for their negligence. Some courts have sought to explain the uneven treatment of service providers by saying that the economic loss rules does not apply to bar negligence actions against defendants who are

---

19. In *Jacques*, we considered the public nature of the professional banking business, explaining that "[t]raditionally banks and their officers have been held to a high degree of integrity and responsiveness to their public calling." *Jacques*, 307 Md. at 542, 515 A.2d at 763. In that discussion, we noted the requirements imposed on the industry by the General Assembly. *Jacques*, 307 Md. at 542–43, 515 A.2d at 763–64. We recognize the importance and instructiveness of requirements imposed on professionals by the General Assembly, and at the same time note that legislative requirements are not the only basis for establishing a tort duty.

professionals, or defendants who are in a special relationship with the plaintiff, or those whose contract obligation does not include production or delivery of a tangible object. It may be that all of these efforts to describe the exception are heuristics—pragmatic short-cuts that might usually but not always coincide with a principled exception. Perhaps, the overriding principle is that defendants who, like attorneys, are in a special relationship with the plaintiff, or who contract to foster the plaintiff's interests and who are not contracting as adversarial bargainers or competitors, should be subject to the duties of care imposed by negligence law. That would explain the cases and offer a realistic basis for judicial decision-making.

Dobbs, *supra,* at 494–95 (footnotes omitted).

In applying the professional standard to title examiners, Judge Meredith, in his dissenting opinion, explained that the standard applies not only to doctors and lawyers, but to professionals that provide paralegal information services, such as examining title. He noted that "[b]ecause the services that were negligently provided by the title companies in this case— *viz.,* examining title and preparing a deed of conveyance— were services that have historically been performed by attorneys, the title companies should be held to the same duty of care that would have applied if the [Partnership] had hired a licensed attorney to provide those services." *Columbia Town Ctr. Title Co.,* 203 Md.App. at 105–06, 36 A.3d at 1011; *see also Jarchow v. Transamerica Title Ins. Co.,* 48 Cal.App.3d 917, 122 Cal.Rptr. 470, 485 (1975), *superseded by statute,* Cal. Ins.Code § 12340.11 (West 2005) (explaining that a title insurance company that supplies the insured with a commitment before a property closing assumes the role [and duty] of a title abstractor to check the records and report any title problems in the preliminary title report); *Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, 553 P.2d 254, 264 (1976) (citations omitted) (comparing a title examiner to an attorney, explaining that a company which is organized for the purpose of examining title assumes similar functions as an attorney and should have similar duties); *Heyd v. Chicago Title Ins. Co.,*

218 Neb. 296, 354 N.W.2d 154, 157–59 (1984) (noting that when a title examiner renders a title report it "serves as an abstractor of title and must list all matters of public record adversely affecting title to the real estate which is the subject of the title report"); Davis, *More Than They Bargained For*, 45 Cath. U.L.Rev. at 87–91 (discussing the different reasons why courts have found title examiners liable in tort).

Similarly, in *Walpert*, although we applied the privity approach, we discussed an additional basis for liability assumed by professional "suppliers of information," as outlined in *Restatement 552*. *Walpert*, 361 Md. at 673–78, 762 A.2d at 597–600. *Restatement (Second) of Torts* § 552 (1977), states:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) the liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

By its terms, *Restatement 552* would limit the title examiner's liability for professional negligence to the title examiner's customer and to those third parties to whom the title examiner either intends to supply the information or actually knows

the customer intended to supply it. *See Walpert,* 361 Md. at 694–95, 762 A.2d at 609 (Wilner, J., concurring).

Judge Meredith also acknowledged *Restatement 552* as a basis for tort liability assumed by title companies. *Columbia Town Ctr. Title Co.,* 203 Md.App. at 106–07, 36 A.3d at 1011–12 (Meredith, J., dissenting). He compared what the Title Companies did in the present case to those who, in the course of their business or profession, negligently supply information for the guidance of others in their business transactions. Under this theory of liability, when the Title Companies provided the preliminary title information to the Partnership, they owed a duty to exercise reasonable care to the Partnership or others that the Title Companies knew would rely on the information. *See Bank of Cal.,* 826 P.2d at 1129 & n. 5 (noting that title companies "have a duty of care concerning the preliminary title information which they transmit to their customers," citing the duty to exercise reasonable care noted in *Restatement 552* ); *cf. Hawkins v. Oakland Title Ins. & Guar. Co.,* 165 Cal.App.2d 116, 331 P.2d 742, 746–48 (1958) (recognizing tort liability based on negligent preliminary reports, noting that the report is issued to guide the insured according to the standard described in *Restatement 552* ); Joyce Dickey Palomar, *Title Insurance Companies' Liability for Failure to Search Title and Disclose Record Title,* 20 Creighton L.Rev. 455, 477–78 (1986).

Therefore, under the privity theory, discussed above, or under *Restatement 552,* the Title Companies owed a duty in tort to its customer, the Partnership, based on the negligent preliminary report contained in the title commitment. We emphasize the duty in tort is separate and independent of a contractual duty, and is a duty undertaken by the title examiner to use a reasonable degree of skill and diligence in conducting the title search and issuing the commitment. *See Corcoran,* 217 Md. at 637, 143 A.2d at 810. The duty explicated herein does not extend to those defects that a reasonable title search would not disclose.

## III.

 Next, we determine whether, on the facts of this case, Chicago Title (the title insurance company) is vicariously liable to the Partnership as a result of the Title Companies' negligent title search.

The parties dispute whether there was an agency relationship between the Title Companies and Chicago Title such that the Partnership could pursue a vicarious liability claim against Chicago Title. Additionally, Chicago Title contends that the title insurance policy, signed by the Partnership and Chicago Title,[20] limits all claims to the insurance policy. The policy states:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, SAFECO TITLE INSURANCE CORPORATION, a Maryland corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;

2. Any defect in or lien or encumbrance on such title;

3. Lack of a right of access to and from the land; or

4. Unmarketability of such title.

The "Conditions and Stipulations" section contains a limitation on liability clause:

12. Limited Liability to this Policy

---

**20.** Because Chicago Title acquired Safeco, and with the acquisition assumed Safeco's title insurance policies, we will refer to the policies as Chicago Title's policies.

This instrument together with all endorsements and other instruments, if any, attached hereto by [Safeco] is the entire policy and contract between the insured and the Company. *Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or any action asserting such claim, shall be restricted to the provisions and conditions and stipulations of this policy.* (Emphasis added).

The trial court found, under the doctrine of *respondeat superior,* that the Title Companies were agents of Chicago Title, and, as such, Chicago Title could be vicariously liable for its agents' negligence. The panel of the intermediate appellate court reversed unanimously, based on, among other reasons, the exculpatory clause included in the insurance policy restricting any claims against Chicago Title to the terms of the contract. *Columbia Town Ctr. Title Co.,* 203 Md.App. at 99–103, 36 A.3d at 1007–10.

We agree with the intermediate appellate court that the title insurance company is not vicariously liable for the Title Companies' negligent title search as reported in the title commitment. We base this holding on the exculpatory language in the agreement between the Partnership and Chicago Title that explicitly precludes a claim in negligence. As such, we need not, and do not, address whether there existed a *respondeat superior* relationship between the Title Companies and Chicago Title.

We interpret the exculpatory language in the insurance policy under the objective theory of contracts. *Ocean Petroleum, Co., Inc. v. Yanek,* 416 Md. 74, 86, 5 A.3d 683, 690 (2010) (citations omitted) (explaining that Maryland courts apply an objective approach to contract interpretation); *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.,* 390 Md. 449, 458–59, 889 A.2d 387, 393 (2006) (noting that we apply the objective interpretation of contracts with equal force to insurance policies). "Thus, our search to determine the meaning of [the] contract is focused on the four corners of the agreement." *Clancy v. King,* 405 Md. 541, 557, 954 A.2d 1092, 1101 (2008)

(citations and quotations omitted). "When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used ... [i]n contrast, a contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *John L. Mattingly Constr. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 326–327, 999 A.2d 1066, 1074 (2010) (citations and quotations omitted). If the language in the contract is ambiguous, the court considers extrinsic evidence clarifying the parties' intentions at the time the contract is executed. *Id.* (citations omitted).

It is well settled in Maryland that exculpatory clauses are generally valid. *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 259, 686 A.2d 298, 301 (1996) (citations omitted). The presumption of validity is consistent with the public policy rationale of freedom to contract. *Wolf v. Ford*, 335 Md. 525, 531, 644 A.2d 522, 525 (1994) (citations omitted). We have noted, with regards to clauses limiting liability for negligence, that:

It is quite possible for the parties expressly to agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent. There is in the ordinary case no public policy which prevents the parties from contracting as they see fit....

*Wolf*, 335 Md. at 531, 644 A.2d at 525 (citing W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 68 at 482 (5th ed.1984)). *See also Restatement (Second) of Contracts* § 195 cmt. a (1981) (explaining that "a party to a contract can ordinarily exempt himself from liability for harm caused by his failure to observe the standard of reasonable care imposed by the law of negligence").

In the present case, the language is unambiguous that Chicago Title's liability is expressly limited to the terms of the policy. *Columbia Town Ctr. Title Co.*, 203 Md.App. at 102, 36 A.3d at 1008–09. The clause states that "*any claim* of loss or

damage, whether or not based on *negligence,* and *which arises out of the status of the title* to the estate ... shall be restricted to the provisions and conditions and stipulations of this policy." *Id.* (emphasis added). This language is clear on its face, and indicates that the parties expressly intended to follow the terms of the policy, even if a negligence claim were plausible. A claim of vicarious liability against Chicago Title for the Title Companies' negligent title search is a "claim of loss or damage," "based on negligence," that "arises out of the status of title." As such, the claimed loss against Chicago Title is "restricted to the provisions and conditions and stipulations of [the] policy." A plain reading of this policy language demonstrates the parties' intent to limit claims against Chicago Title to the contract. *See Columbia Town Ctr. Title Co.,* 203 Md.App. at 102, 36 A.3d at 1009. Therefore, Chicago Title may not be held vicariously liable for negligence.[21]

We note, however, that in certain circumstances, the public interest will not permit, and the judiciary will not enforce, exculpatory clauses in contracts. *Adloo,* 344 Md. at 260, 686 A.2d at 301 (citations omitted). Non-enforcement may occur, for example, when legislation proscribes such clauses. *See Nat'l Glass, Inc. v. J.C. Penney Props., Inc.,* 336 Md. 606, 615, 650 A.2d 246, 250 (1994) (holding, based on a statute in the Maryland Real Property Article, that a contractual provision waiving the right to claim a mechanic's lien is void as against public policy); *Bethlehem Steel Corp. v. G.C. Zarnas & Co., Inc.,* 304 Md. 183, 190–95, 498 A.2d 605, 608–11 (1985) (noting the legislature's explicit determination that indemnification clauses in construction contracts providing for indemnity against the tortfeasor's own negligence are unenforceable pursuant to public policy); *see also* Md.Code (1974, 2010 Repl.Vol.), § 8–105 of the Real Property Article (prohibiting certain exculpatory clauses for a landlord's negligence); Md. Code (1973, 2006 Repl.Vol., 2012 Cum.Supp.), § 5–401 of the

---

**21.** Another jurisdiction has held similar clauses to "at best relate to a matter of defense, not to prohibition of a cause of action based on negligence." *Heyd v. Chicago Title Ins. Co.,* 218 Neb. 296, 354 N.W.2d 154, 159 (1984).

Courts and Judicial Proceedings Article (prohibiting certain construction indemnity clauses).

There are three general circumstances in which exculpatory clauses are deemed invalid and will not be enforced:

> First, a party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross. Second, the contract cannot be the product of grossly unequal bargaining power. When one party is at such an obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence, the agreement is void as against public policy. Third, public policy will not permit exculpatory agreements in transactions affecting the public interest. This last category includes the performance of a public service obligation, e.g., public utilities, common carriers, innkeepers, and public warehousemen. It also includes those transactions, not readily susceptible to definition or broad categorization, that are so important to the public good that an exculpatory clause would be patently offensive, such that the common sense of the entire community would ... pronounce it invalid.

*Wolf,* 335 Md. at 531–32, 644 A.2d at 525–26 (citations and quotations omitted). We determine what constitutes the public interest under the "totality of the circumstances of any given case against the backdrop of current societal expectations." *Wolf,* 335 Md. at 535, 644 A.2d at 527. We have explicitly rejected a rigid test in making this determination.[22]

---

**22.** Factor tests, such as the *"Tunkl* test," enunciated in Maryland in *Winterstein v. Wilcom,* 16 Md.App. 130, 136–37, 293 A.2d 821, 825 (1972), may be used to guide the court, although its six factors are not meant to be conclusive. *See Wolf v. Ford,* 335 Md. 525, 532–35, 644 A.2d 522, 526–27 (1994). These factors are:

> It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the

Based on the evidence presented by the parties, "the three exceptions to the general rule permitting exculpatory clauses" are not applicable in the present case. *See Wolf,* 335 Md. at 535, 644 A.2d at 527–28. There has been no allegation of fraud or of extreme forms of negligence. Additionally, there is no evidence of disparate bargaining power. The parties in the present case (save perhaps the Miller sisters) are sophisticated commercial entities that have likely engaged in similar real property transactions in the past. Perhaps if there were evidence that the contract was a contract of adhesion, "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who had no real opportunity to bargain about its terms," we would scrutinize the exculpatory language differently. *Walther v. Sovereign Bank,* 386 Md. 412, 430, 872 A.2d 735, 746 (2005) (citations and quotations omitted). Finally, the Partnership has not directly asserted any public policy arguments as to why the clause should not be enforced, nor has the Legislature indicated that Maryland public policy requires that we "should disturb the parties' ability to contractually exempt a party from liability for negligence." *Wolf,* 335 Md. at 536–37, 644 A.2d at 528.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO ENTER A JUDGMENT CONSISTENT WITH THIS OPINION. THE PARTNERSHIP AND THE TITLE COMPA-**

---

public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Winterstein,* 16 Md.App. at 136–37, 293 A.2d at 825 (citing *Tunkl v. Regents of the Univ. of Calif.,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 445–46 (1963)).

NIES (CAMBRIDGE AND COLUMBIA) TO DIVIDE THE
COSTS IN THIS COURT AND THE COURT OF SPECIAL
APPEALS.