PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA, formerly
known as Travelers Indemnity
Company of Illinois,

        *Plaintiff-Appellant,*

        v.

LIBERTY MUTUAL INSURANCE
COMPANY,

        *Defendant-Appellee.*

No. 05-1226

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(CA-00-1118-WMN)

Argued: January 31, 2006

Decided: April 12, 2006

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

---

Reversed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge King joined.

---

## COUNSEL

**ARGUED:** Dale E. Hausman, WILEY, REIN & FIELDING, L.L.P., Washington, D.C., for Appellant. Warren D. Stephens, DECARO, DORAN, SICILIANO, GALLAGHER & DEBLASIS, L.L.P., Lan-

ham, Maryland, for Appellee. **ON BRIEF:** Jennifer S. Huber, WILEY, REIN & FIELDING, L.L.P., Washington, D.C., for Appellant.

## OPINION

NIEMEYER, Circuit Judge:

In this case, we resolve a dispute between two insurance companies over coverage for liability to which Ryland Mortgage Company became exposed.

On May 28, 1994, in Los Angeles, Steve Fallen fell down a damaged stairwell in a residential duplex owned by State Street Bank, seriously injuring himself. He filed suit in California state court against both State Street Bank and Ryland, which State Street had retained to manage the property, alleging that the defendants negligently failed to repair the stairway and to warn of its dangerous condition. Ryland commenced this action against Travelers Indemnity Company of Illinois, its insurer, and against Liberty Mutual Insurance Company, State Street's insurer, to provide it the costs of defending the underlying action in Los Angeles. Travelers thereafter agreed to provide a defense and filed a cross-claim against Liberty Mutual for contribution to the costs because, it claimed, Ryland was an "additional insured" under the policy Liberty Mutual issued to State Street.

The district court, ruling on the insurance companies' cross-motions for summary judgment, entered judgment in favor of Liberty Mutual, concluding that Ryland was not an additional insured under Liberty Mutual's policy. The court also concluded that because the management contract between Ryland and State Street provided that Ryland would indemnify State Street for liability arising from Ryland's activities, State Street "has not undertaken any obligation to insure Ryland's actions" and Liberty Mutual would thereby have no responsibility.

Because Ryland concededly managed the duplex for State Street, we conclude that it was a "real estate manager" and therefore an addi-

tional insured under the terms of Liberty Mutual's policy. Accordingly, we reverse. We reject the district court's argument that the contract between Ryland and State Street somehow abrogated Liberty Mutual's independent contractual obligation to provide coverage to Ryland.

I

In December 1992, Bruce Stein and Mark Mintz purchased a multiple-family residential building located at 912-914 South Holt Avenue in Los Angeles, California. They financed the purchase with a loan from Columbia Savings and Loan, which was secured by a deed of trust on the property. Upon Columbia Savings and Loan's subsequent failure, its loans were taken over by the Resolution Trust Corporation and thereafter assigned to State Street Bank as trustee to hold and manage Columbia Savings and Loan's loans and deeds of trust.

In an arrangement between the Resolution Trust Corporation acting as conservator of Columbia Savings and Loan Association, State Street, and Ryland, Ryland agreed to service the loans pursuant to a "Pooling and Servicing Agreement" (referred to hereafter as the "Pooling Agreement"). Under the Pooling Agreement, Ryland agreed to collect payments from mortgagors and in all other respects to manage the loans for State Street. When mortgagors defaulted on their loans, Ryland agreed to foreclose on the securing properties, maintain and manage them, and to arrange for their prompt disposition through sale. The Pooling Agreement provided that Ryland was required to arrange for the disposition of a foreclosed property "within two years of its acquisition."

A vice president of Ryland testified in deposition that when a property was foreclosed upon by Ryland, it became owned by State Street, and that during the period when State Street owned a property through foreclosure, Ryland was obligated to manage the property and maintain its value until final disposition. Ryland's responsibilities included inspecting and securing the property, preventing vandalism and the accumulation of hazardous materials, and hiring a realtor to assess the property and list it at fair market value. The vice president explained that Ryland subcontracted some of these property manage-

ment functions to PHH Asset Management, but in doing so, remained "ultimately responsible for the outcome of all those functions and managing that process [of property disposition]."

When Stein and Mintz defaulted on their note secured by their Holt Avenue property in Los Angeles, Ryland as loan servicer foreclosed on the property in April 1994 and State Street thus became the owner of the property.

On May 28, 1994, while State Street was owner of the Holt Avenue property, Steve Fallen visited the property and fell down the back staircase, sustaining injuries. He alleged that the rear stairs of the property had been damaged as a result of the Northridge earthquake in January 1994 and that, at the time of his fall, the damage had still not been repaired. He commenced an action against State Street and Ryland as State Street's manager in California state court, alleging a negligent failure to repair the staircase and a negligent failure to warn.

Upon being sued by Fallen, Ryland submitted the lawsuit to its own insurer, Travelers, and to State Street's insurer, Liberty Mutual, claiming that it was owed a defense as the named insured under the Travelers policy and as an additional insured under the Liberty Mutual policy. When both companies denied coverage, Ryland commenced this action in the District of Maryland against both insurance companies. Travelers shortly thereafter assumed Ryland's defense in the state proceeding and filed a cross-claim against Liberty Mutual in this action to obtain contribution on the ground that Ryland was an additional insured under Liberty Mutual's policy. Travelers claimed that the Liberty Mutual policy insured not only State Street Bank but also any "real estate manager" of State Street Bank and that Ryland was State Street's real estate manager. Liberty Mutual responded by stating that Ryland's role was "the servicing of mortgages, not real estate management."

On cross-motions for summary judgment, the district court granted Liberty Mutual's motion and denied Travelers' cross-motion. Applying the law of Maryland, the court concluded that Travelers had failed to produce evidence that Ryland in fact performed as State Street's "real estate manager," stating,

Ryland appears to meet the initial threshold to be deemed a real estate manager because its alleged managerial actions appear to have been performed primarily for the benefit of others and not pursuant to a duty arising by operation of law. That, however, does not end the inquiry. This Court must examine the particular facts of this case to determine if Ryland was a real estate manager as a matter of law.

The court thereafter reasoned that even though the Pooling Agreement required Ryland to manage the property, there was no evidence "that Ryland actually performed these authorized insurance and foreclosure actions." Accordingly, it could not demonstrate that it was in fact a "real estate manager" for State Street, for which State Street's insurance policy provided coverage. The district court also held that the indemnification provision in the Pooling Agreement, by which Ryland agreed to indemnify State Street, was sufficient to demonstrate that State Street's insurer, Liberty Mutual, never intended to provide Ryland with insurance coverage. The court reasoned that to hold otherwise would require it "to construe a contract in which the Trustee [State Street] is indemnified by the Servicer [Ryland], who is then indemnified by the Trust, as providing for the Trustee's insurer to cover the expenses of the Servicer." The court concluded that interpreting the agreement in that way would yield "an absurd or unreasonable result."

From the judgment in favor of Liberty Mutual, Travelers filed this appeal.

## II

The policy issued by Liberty Mutual, which is the policy at issue in this case, names State Street as the "named insured" and, in a section identified as "Who is an insured," includes State Street's executive officers and directors as insureds with respect to their duties as officers and directors. That section also provides:

Each of the following is also an insured:

(a)    [State Street's] employees, other than [State Street's] executive officers, but only for acts within the scope of their employment by [State Street]. . . .

(b)   Any person (other than [State Street's] employee[s]), or any organization while acting as [State Street's] real estate manager.

Travelers as subrogee of Ryland asserts that Ryland is State Street's "real estate manager" and therefore is an insured under Liberty Mutual's policy. It argues that the relationship between State Street and Ryland is defined by the Pooling Agreement, which imposes on Ryland the duty to manage property owned by State Street. Accordingly, a liability incurred during Ryland's management of State Street's real property, Travelers asserts, is covered by the insurance.

We agree. The record in this case demonstrates without factual contradiction that Ryland was State Street's real estate manager at the time of Steve Fallen's accident. While it is true that the Pooling Agreement was designed principally to establish Ryland as the servicer of the mortgages in State Street's portfolio, it also obligated Ryland, in connection with Ryland's servicing of those mortgages, to foreclose on a property when the mortgage became in default and to take title of the property for and in the name of State Street. The Pooling Agreement also provided that, once a property was owned by State Street, Ryland was responsible for managing the property and maintaining its value until it was disposed of by sale on behalf of State Street. As Ryland's vice president testified, under the Pooling Agreement Ryland was required to

> inspect the property, make sure that the property is not vandalized, make sure that the property is secured by having proper locks and things like that, make sure that there's not hazardous material on the property, engage a Realtor to perform the market comparative analysis, that the property is listed at a fair market value[.] . . . [E]ventually the goal was to dispose of the property.

To carry out some of these responsibilities of managing and maintaining the property under the Pooling Agreement, Ryland subcontracted with PHH Asset Management under a separate agreement entitled "Property Management and Disposition Agreement," to have it perform on behalf of Ryland the following:

6. Property Preservation — Perform or supervise the performance of all maintenance necessary to keep the property in "marketable condition" . . . . All maintenance bills will be paid directly by PHH Asset Management and reimbursed by [Ryland] on a monthly basis.

\*     \*     \*

7. Property Repairs and Improvements — Perform or supervise the performance of all repair and improvement work as requested and approved by [Ryland]. All direct costs related to the procurement of bids and all repair and improvement bills will be paid directly by PHH Asset Management and reimbursed by [Ryland] on a monthly basis. . . .

In short, with respect to property owned by State Street, Ryland was obligated to manage and maintain the property pending its disposition. There is no evidence in the record to the contrary. Indeed, at oral argument, counsel for Liberty Mutual agreed that State Street owned the Holt Avenue property at the time of Fallen's accident and that Ryland was charged with managing the property for State Street until the property's disposition. Because there can be no dispute that at the time Fallen sustained his injuries, State Street owned the property and Ryland managed it, there also can be no dispute that at that time Ryland was a real estate manager for State Street and therefore covered by Liberty Mutual's policy.

The phrase "real estate manager," as used in Liberty Mutual's policy, is not defined by the policy, and therefore it should be given its ordinary meaning. Accordingly, we conclude, unremarkably, that a "real estate manager" of State Street is a person or entity that manages State Street's real property for State Street. *See Savoy v. Action Products Co.*, 324 So. 2d 921, 923 (La. Ct. App. 1975); *see also Ins. Co. of N. Am. v. Hilton Hotels U.S.A., Inc.*, 908 F. Supp. 809, 815 (D. Nev. 1995), *aff'd*, 110 F.3d 715 (9th Cir. 1997) (following *Savoy*); *Cal. Union Ins. Co. v. City of Walnut Grove*, 857 F. Supp. 515, 521 (S.D. Miss. 1994) (same).

Liberty Mutual makes two arguments that have no basis in the language of the policy and the facts of the record. First, it argues that

> Stein and Mintz as mortgagors, would have been the benefi-
> ciaries of the management of the property by a mortgagee
> in possession [State Street]. It would be the mortgagor's pol-
> icy, that is, the liability insurance of Stein and Mintz that the
> mortgagee in possession, as a real estate manager, would
> look to. In this case, Ryland's argument would be that it had
> coverage as a real estate manager under Stein and Mintz's
> insurance policy . . . . Ryland, at best, might meet the defini-
> tional threshold of a real estate manager for Stein and Mintz,
> the mortgagors, not State Street Bank.

The difficulty with this argument is that it focuses on the status of the property during the period before State Street foreclosed on the mortgage and became owner of the property. Before foreclosure, it is true that State Street was only the mortgagee and Ryland was only the servicer of the mortgage for State Street. Had the accident happened before foreclosure, Liberty Mutual would have been correct in argu-ing that liability would rest with the owners of the property — Stein and Mintz — or their real estate manager, if they had one. But the accident in this case happened after State Street had become the owner of the property through foreclosure. When State Street became the owner of the property, it also became subject to premises liability of the kind that was created when Fallen was injured. And it was in part to discharge its obligation as owner that State Street engaged Ryland to manage the property. Thus when foreclosure occurred, Ryland's role with respect to the Holt Avenue property was trans-formed from that of a mortgage servicer to that of a real estate man-ager. Liberty Mutual's argument does not recognize this transformation.

Liberty Mutual also argues that because a real estate manager is one "who manages real estate for another," Ryland did not fit this relationship because Ryland was "just a servicer" of mortgages, and not a real estate manager. In addition, it argues that because the ser-vicing agreement defines Ryland as an independent contractor servic-ing loans, Ryland could not, as an independent contractor, be an agent of State Street.

Again, Liberty Mutual misconstrues both State Street and Ryland's respective roles following foreclosure and the legal scope of agency.

Once the property was foreclosed on and title was taken in the name of State Street, State Street became responsible for maintaining the property and likewise became exposed to premises liability. It discharged that responsibility by retaining Ryland to manage the property and maintain it until Ryland could dispose of the property to some third party. Whether Ryland performed those tasks as an independent contractor, as a servant, or as an employee would make no difference. It was acting for State Street in discharging State Street's responsibility to Steve Fallen, and therefore Ryland was an agent of State Street with respect to the property. Just as a lawyer or a tax preparer is an agent for his or her client (albeit an independent contractor), so too was Ryland the agent for State Street. *See Green v. H&R Block, Inc.*, 735 A.2d 1039, 1044 (Md. 1999) (holding that the relationship between H&R Block and its customers for the preparation of tax returns was that of principal-agent).

Finally, Liberty Mutual adopts the district court's reasoning that while Ryland may have had the responsibilities of a real estate manager under the Pooling Agreement, there was no evidence that it actually performed that function. The undisputed evidence in the record, however, is to the contrary. Ryland recognized its responsibilities under the Pooling Agreement to manage and maintain property owned by State Street. The agreement not only provides as much but Ryland's executives testified to carrying out that function. Moreover, Ryland engaged PHH Asset Management to provide for the maintenance and repair of State Street's real property. But even if Ryland failed to perform the functions it undertook, that fact would make no difference to whether Ryland was a real estate manager. Indeed, the liability asserted in the underlying case arises from the allegation that Ryland *failed* to make repairs to the Holt Avenue property and therefore was negligent.

Of course, the fact that Ryland failed to make a repair does not cause it to lose coverage for liability imposed for that failure, and Liberty Mutual cannot rationally be contending that Ryland's failure to perform as a real estate manager therefore led to its loss of insurance coverage. That would undermine the very purpose for the insurance. If the actual performance of duties was required, in addition to a legal obligation to perform them, to meet the definition of "real estate manager," then Ryland's purported negligence in performing as a real

estate manager would mean that it lacked coverage as an additional insured. Travelers observes, and we agree, that this interpretation of Liberty Mutual's insurance policy leads to an absurdity — that an insured loses coverage in precisely those circumstances for which it anticipated needing insurance.

Accordingly, we conclude that Liberty Mutual's policy provides coverage to Ryland as an additional insured because Ryland was State Street's real estate manager for the Holt Avenue property at the time of Fallen's accident. The parties have agreed that under those circumstances, the Travelers policy and the Liberty Mutual policy share the costs of Ryland's defense.

### III

In granting summary judgment for Liberty Mutual, the district court held that, regardless of the evidence concerning Ryland's management activities, the terms of the Pooling Agreement were sufficient to demonstrate that State Street "never contemplated providing any insurance coverage for Ryland," because Ryland had agreed to indemnify State Street for State Street's management activities at the Holt Avenue property. The court held that it was "unreasonable to construe a contract in which the Trustee [State Street] is indemnified by the Servicer [Ryland], who is then indemnified by the Trust, as providing for the Trustee's insurer to cover the expenses of the Servicer." Relying on this reasoning, Liberty Mutual argues that allowing Ryland to recover would result in circular litigation, since Liberty Mutual could then seek recovery from Ryland based on a subrogation claim arising from Ryland's agreement to indemnify State Street. Thus, Liberty Mutual contends that, ultimately, Travelers, as Ryland's insurer, would have to pay for the costs of the underlying action.

Liberty Mutual's argument, however, conflates its obligation to insure Ryland directly and its separate obligation to insure State Street. This conflation fails to account for the fact that Liberty Mutual has an *independent* obligation to insure Ryland as an additional insured, regardless of State Street's liability.

Liberty Mutual argues that this blurring of insurance contracts and the underlying indemnity agreement is justified by our decision in *St.*

*Paul Fire and Marine Insurance Co. v. American International Speciality Lines Insurance Co.*, 365 F.3d 263 (4th Cir. 2004). In *St. Paul*, the insureds of several insurance companies became jointly and severally responsible for the food poisoning of the plaintiff in the underlying action and accordingly settled with the plaintiff before seeking to resolve the allocation of insurance coverage. After the settlement, the insurance companies instituted an action in which we held that *before* the insurance coverage could be determined and allocated, the liability of the insureds needed to be determined, including contractual liability created by an indemnification clause between two of the insureds. *Id.* at 268. When the analysis for underlying liability was conducted, it was determined that final responsibility for the food poisoning was shifted by reason of an indemnification clause from the insured of one insurance company to the insured of another. We held therefore that coverage followed, because the insurance covered the liability of the insureds as determined not only by law but also by application of their indemnification agreements. As we said, "[A]n indemnity agreement between the insureds or a contract with an indemnification clause . . . may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." *Id.* at 270-71 (internal quotation marks and citation omitted). Thus, responsibility for insurance coverage followed the liability of the insureds.

The principles of *St. Paul*, however, are not relevant to the case before us. The issue here is coverage for *only* Ryland's liability. Travelers concededly insured Ryland, and because of Liberty Mutual's insuring language, it must also insure Ryland through its additional insureds clause. This is not a case where we are determining State Street's liability vis-à-vis Ryland's. The fact that Ryland agreed to indemnify State Street under the Pooling Agreement does not absolve Liberty Mutual of its independent contractual obligation to insure Ryland as State Street's "real estate manager." If the issue in this case turned on the underlying liability as between Ryland and State Street, we would likely conclude, as Liberty Mutual urges, that Ryland bore full responsibility because of its indemnification agreement. But even then, having determined that Ryland had legal responsibility for Steve Fallen's injuries, we would still have to determine who insured that liability. In this case Travelers concededly provided coverage, as it issued a policy directly to Ryland as the named insured. But Liberty

Mutual, which issued a policy to State Street as its named insured, also provided coverage to additional insureds, not because of any indemnity clause running in favor of its insured State Street but because of its independent undertaking to Ryland.

Thus, because we are deciding coverage for only Ryland's liability to Steve Fallen, the indemnification agreement is irrelevant. Once Ryland's liability is determined, as *St. Paul* instructs, we then look to the insurance policies for coverage of the liability. In this case, both Travelers and Liberty Mutual issued policies that covered Ryland, and accordingly they must share the costs of its defense.

For the foregoing reasons, the judgment of the district court is reversed.

*REVERSED*