**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1801**

INTERSTATE FIRE AND CASUALTY COMPANY,

                Plaintiff - Appellant,

        v.

DIMENSIONS ASSURANCE LTD.,

                Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.   George J. Hazel, District Judge. (8:13-cv-03908-GJH)

Argued: September 23, 2016          Decided: December 6, 2016

Before TRAXLER, SHEDD, and FLOYD, Circuit Judges.

Vacated and remanded by published opinion.  Judge Traxler wrote the opinion, in which Judge Shedd and Judge Floyd joined.

**ARGUED**: Paulette Steffes Sarp, HINSHAW & CULBERTSON LLP, Minneapolis, Minnesota, for Appellant.    Robert Lawrence Ferguson, Jr., FERGUSON, SCHETELICH & BALLEW, P.A., Baltimore, Maryland, for Appellee.  **ON BRIEF**: Suzanne L. Jones, HINSHAW & CULBERTSON LLP, Minneapolis, Minnesota; Robert C. Morgan, MORGAN, CARLO, DOWNS & EVERTON, P.A., Hunt Valley, Maryland, for Appellant.

TRAXLER, Circuit Judge:

The question in this insurance coverage dispute is whether a nurse employed by a staffing agency and assigned to work at a hospital qualifies as an "employee" of the hospital under the hospital's insurance policy. The district court answered that question in the negative and granted summary judgment to the hospital's insurer. For the reasons set forth below, we vacate the district court's order and remand for further proceedings.

I.

A.

Favorite Healthcare Staffing (the "Agency") is an employment agency that provides nurses and other health care professionals to Laurel Regional Hospital (the "Hospital"). The contract between the Agency and the Hospital (the "Staffing Agreement") states that the Agency-provided practitioners assigned to the Hospital are the employees of the Agency, not the Hospital.

Under the Staffing Agreement, the Hospital is responsible for "orient[ing] [Agency practitioners] to [their] job description responsibilities and all policies and procedures necessary to meet [Hospital] performance standards." J.A. 25. The Hospital has the right under the Agreement to "float" Agency practitioners to areas to which they were not originally assigned and to immediately terminate any practitioner who

2

refuses to float. The Agreement also gives the Hospital the right to "dismiss any Practitioner at any time if [the Hospital] determines that a Practitioner is unsatisfactory." J.A. 28.

As established through discovery, no Agency staff supervises the practitioners on site at the Hospital or provides medical-care instructions to the practitioners. The Hospital dictates the type of care to be provided to patients by Agency practitioners; whether Agency practitioners or direct-hire employees are involved, the Hospital expects the same level of care to be provided to patients. If an Agency practitioner refuses to comply with Hospital directions, the Hospital may immediately terminate the practitioner.

B.

Appellant Interstate Fire and Casualty Company issued a professional liability insurance policy to the Agency that covered doctors and nurses who were employed by the Agency and placed by the Agency to work at various medical facilities. Appellee Dimensions Assurance Ltd., an insurance company wholly owned by the company that owns the Hospital, issued the Hospital the liability insurance policy (the "Policy") at issue in this case.

The Policy provides coverage to the Hospital and to other persons or entities who meet its definitions of "protected person." The Policy consists of three main parts, one providing

3

coverage for "General Liability," another providing coverage for "Hospital Professional Liability," and another providing coverage for "Group Physicians Professional Liability." J.A. 105-06.

The professional-liability section of the Policy includes multiple categories of persons and entities in its definition of "protected person," including certain administrators and committee and board members. In a provision titled "Worker Protection," this section of the Policy provides that

> [The Hospital's] present and former employees, students and authorized volunteer workers are protected persons while working or when they did work for you within the scope of their duties. Unless added by amendment to this Agreement, interns, externs, residents, or dental, osteopathic or medical doctors are not named protected persons for professional injury, even if they are your employees, students or authorized volunteer workers.

J.A. 134 (emphasis added).

Under the general-liability portion of the Policy, the "Worker Protection" clause extends "protected person" status to certain Hospital workers:

> [The Hospital's] present and former employees, students and authorized volunteer workers are protected persons while working, or when they did work for you within the scope of their duties. Persons working for you on a per diem, agency or contract basis are not protected persons.

4

J.A. 119 (emphasis added). The Policy does not define "employee," nor does it incorporate or otherwise refer to the Staffing Agreement between the Agency and the Hospital.

C.

In 2012, a former patient brought a medical malpractice action (the "Underlying Action") against the Hospital and several of its doctors and nurses. One of the defendants was Nurse Cryer, who had been placed by the Agency at the Hospital. Claiming that she was not an employee of the Hospital, Dimensions refused to defend Cryer. Interstate thereafter undertook to defend Cryer, ultimately settling the case against her for $2.5 million and incurring nearly $500,000 in defense costs.

Interstate subsequently filed this equitable contribution action against Dimensions in federal district court. Interstate alleged that, under the terms of the Policy, Nurse Cryer qualified as an employee of the Hospital and thus a "protected person" entitled to coverage under the Policy. Because the coverage provided by the Dimensions policy was primary and the coverage provided by the Interstate policy was "excess" in cases where there was other valid insurance coverage, Interstate alleged that Dimensions was responsible for the entire amount it paid to defend and settle the claims against Nurse Cryer.

5

The district court granted summary judgment in favor of Dimensions. Relying on the terms of the Staffing Agreement between the Hospital and the Agency, the district court held that Agency-provided workers were not employees within the meaning of the Policy. Interstate appeals, arguing that Nurse Cryer qualifies as an employee under the plain terms of the Policy and that the district court erred by looking to a separate contract between different parties to determine the meaning of the Policy.

II.

This insurance dispute, which falls within our diversity jurisdiction, is governed by the law of Maryland, where the action was filed and the insurance policy delivered. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (explaining that a federal court sitting in diversity must apply the choice of law principles of the forum state); Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 100 (4th Cir. 2013) ("In insurance contract disputes, Maryland follows the principle of lex loci contractus, which applies the law of the jurisdiction where the contract was made. For choice of law purposes, a contract is made where the last act is performed which makes the agreement a binding contract. Typically, this is where the policy is delivered and the

6

premiums paid." (internal quotation marks and citation omitted)).

Maryland courts interpret insurance policies "with the same principles and rules of construction . . . use[d] to interpret other contracts." Connors v. Gov't Employees Ins. Co., 113 A.3d 595, 603 (Md. 2015). "Unless there is an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning." Maryland Cas. Co. v. Blackstone Int'l Ltd., 114 A.3d 676, 681 (Md. 2015) (internal quotation marks omitted). Accordingly, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." Long v. State, 807 A.2d 1, 8 (Md. 2002) (internal quotation marks and alteration omitted).

There is no dispute that, if the other requirements of the Policy are satisfied, the claims asserted against Nurse Cryer in the Underlying Action fall within the scope of the professional-liability section of the Policy. The question, then, is whether Cryer qualifies as a protected person under that section of the Policy.

A.

Interstate argues on appeal that Nurse Cryer qualifies as a Hospital employee and therefore a protected person under the

7

unambiguous provisions of the professional-liability section of the Policy. As Interstate points out, the Policy clearly excludes Agency-provided practitioners from its definition of "employee" in the general-liability portion of the Policy, but it does not exclude Agency-provided practitioners from the definition in the professional-liability section of the Policy, which is the section applicable to the claims at issue in this case. In Interstate's view, the fact that the general-liability definition excludes Agency-provided practitioners while the professional-liability definition does not exclude them demonstrates that the Policy provides coverage for Nurse Cryer. The presence of this language in the general-liability section shows that Dimensions knew the Hospital was staffed by direct-hire and Agency-provided practitioners and that the word "employee" as used in the Policy includes direct-hire employees and Agency-provided practitioners. After all, if "employee" did not include Agency-provided practitioners, then there would have been no need to specifically exclude them from the general-liability definition of "protected person." See Rigby v. Allstate Indem. Co., 123 A.3d 592, 597 (Md. Ct. Spec. App. 2015) (noting the "basic principle of contract interpretation" that courts should "give effect to each clause of an insurance policy, and avoid treating either term as surplusage" (internal quotation marks and citation omitted)); see also Gates, Hudson &

8

Assocs., Inc. v. Fed. Ins. Co., 141 F.3d 500, 503 (4th Cir. 1997) ("Federal's careful delineations of specific types of injuries at other points in the policy suggest that the insurer knew how to limit the term when it desired to do so.").

We agree. Dimensions' decision to use different language in different sections of the Policy when addressing the coverage available to "employees" must be understood as an intentional decision. Cf. NISH v. Cohen, 247 F.3d 197, 203–04 (4th Cir. 2001) ("The omission by Congress of language in one section of a statute that is included in another section of the same statute generally reflects Congress's intentional and purposeful exclusion in the former section."). Under Maryland law, we must respect this decision and apply the Policy in a way that gives effect to the full "Worker Protection" clause in the general-liability section and to the full "Worker Protection" clause in the professional-liability section. The only way to do that is, as Interstate argues, to conclude that the term "employee" as used in the Policy includes Agency-provided Hospital workers as well as direct-hire Hospital workers. Accordingly, because the professional-liability section of the Policy extends "protected person" status to Hospital workers without excluding Agency-provided workers, we conclude that Nurse Cryer is a protected person under the professional-liability section of the Policy.

Dimensions, however, insists that the Policy itself prevents us from considering the language of the general-liability section as a guide to the meaning of the professional-liability section of the Policy.  The "General Rules" portion of the Policy states that each "agreement" (the three sections of the policy separately addressing coverage for general liability, hospital professional liability, and group physicians' professional liability) must "be read and interpreted separately and independently of the other and <u>no terms, conditions or exceptions from one agreement shall be construed to apply to any other agreement or provide a basis for interpretation of any other agreement</u>."  J.A. 110 (emphasis added).  Relying on this provision, Dimensions contends that this court may not look to the terms of the general-liability section to determine the scope of coverage provided under the professional-liability section.

We need not decide whether the Policy provision operates in the manner urged by Dimensions.  Even if we examine the professional-liability section of the Policy in isolation, without consideration of the terms of the other sections of the Policy, we still conclude that the Policy provides coverage for the claims asserted against Nurse Cryer.

If we examine the professional-liability portion of the Policy alone, we are presented with an insurance policy that provides coverage to Hospital "employees" but does not define the term. In the absence of a definition or other "indication that the parties intended to use words in the policy in a technical sense," Lloyd E. Mitchell, Inc. v. Maryland Cas. Co., 595 A.2d 469, 475 (Md. 1991), unambiguous policy language must be given its "customary, ordinary, and accepted meaning, as determined by the fictional reasonably prudent lay person," Connors 113 A.3d at 603 (internal quotation marks omitted).

A policy term "is not ambiguous simply because it is general in nature or undefined by the policy." Walker v. Fireman's Fund Ins. Co., 505 A.2d 884, 886 (Md. Ct. Spec. App. 1986). Instead, a term "is considered ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." Connors, 113 A.3d at 603 (internal quotation marks omitted). To determine whether a policy term is ambiguous, we look only to the policy itself; we may not look to extrinsic sources to create an ambiguity. See Univ. of Balt. v. Iz, 716 A.2d 1107, 1121 (Md. Ct. Spec. App. 1998); cf. Schneider v. Continental Cas. Co., 989 F.2d 728, 731 (4th Cir. 1993) ("A court may not, where the contractual language is clear, invite or accept the submission of extrinsic evidence, 'find' ambiguity

11

in the contractual text based upon that evidence, and resolve the found ambiguity by resort to that extrinsic evidence.").

Interstate contends that "employee" is an unambiguous term whose ordinary, customary meaning tracks the common-law right-to-control test used to determine the existence of a master-servant relationship. See Whitehead v. Safway Steel Prods., Inc., 497 A.2d 803, 808-09 (Md. 1985) ("This Court has traditionally considered five criteria in determining whether or not an employer/employee relationship exists between two parties. These criteria . . . include (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer."). Interstate also contends that the ordinary meaning of "employee" encompasses "borrowed" employees like Nurse Cryer, who are paid by one employer but work under the direct control of another. See, e.g., Temp. Staffing, Inc. v. J.J. Haines & Co., 765 A.2d 602, 603 n.1 (Md. 2001).

We agree with Interstate that the undefined term "employee" is unambiguous. See C & H Plumbing & Heating, Inc. v. Employers Mut. Cas. Co., 287 A.2d 238, 239-40 (Md. 1972) (finding no ambiguity in clause excluding coverage for dishonest or criminal act of "employee of the insured"); accord Interstate Fire & Cas. Co. v. Washington Hosp. Ctr. Corp., 758 F.3d 378, 387 (D.C. Cir.

12

2014) (policy providing coverage to all "employees" of hospital was unambiguous); Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm, 652 N.E.2d 684, 686 (Ohio 1995) ("[T]he term "employee" is not defined, but does have a plain and ordinary meaning."). And we likewise agree with Interstate that the common and ordinary meaning of "employee" incorporates the right-to-control test. See Interstate Fire, 758 F.3d at 386-87 (applying common-law "right-to-control" test to define "employee" for purposes of insurance policy issued to hospital utilizing nurses provided by staffing agency); see also Black's Law Dictionary (10th ed. 2014) (defining "employee" as "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance" (emphasis added)); Mutual Fire Ins. Co. v. Ackerman, 872 A.2d 110, 113 (Md. Ct. Spec. App. 2005) (looking to Black's to determine the ordinary meaning of an undefined term).

There can be no question that Nurse Cryer qualifies as an employee of the Hospital under the right-to-control test. In Whitehead v. Safway Steel Products, the Maryland Court of Appeals applied the right-to-control test to conclude that Safway was the employer of Whitehead, a worker who had been assigned to Safway by a temporary staffing agency: "Safway instructed Whitehead on the task to be performed, supervised his

13

work, and was free to reassign him to any other duties that warranted attention. If Whitehead's work was unsatisfactory, Safway was free to dismiss him and request an additional worker." 497 A.2d at 809. The Hospital's control over Cryer, as established by the undisputed evidence in the record, mirrors that of the staffing agency customer in Whitehead, and Nurse Cryer therefore is an employee of the Hospital as a matter of law. See id. ("[T]emporar[y workers] . . . who work in employment circumstances similar to the one here present, are as a matter of law, employees of the customer"); see also Interstate Fire & Cas. Co., 758 F.3d at 386-87 (concluding that nurse paid by staffing agency and assigned to work at hospital was employee of hospital under insurance policy covering hospital "employees").

Accordingly, we conclude that the provision in the professional-liability section of the Policy extending "protected person" status to "employees" of the Hospital is unambiguous. The plain and ordinary meaning of "employee" includes those who qualify as employees under the right-to-control test, and the evidence in the record establishes that Nurse Cryer qualifies as an employee of the Hospital under that test.

III.

Dimensions makes two arguments in support of its contrary reading of the Policy. It first argues that the term "employee" must be interpreted in light of the Staffing Agreement between the Hospital and the Agency. It also argues that Nurse Cryer qualifies as an "affiliated healthcare provider" under the terms of the Policy but fails to meet the requirements for coverage to extend to her in that capacity. We find neither of these arguments persuasive.

A.

Dimensions first contends that we should define "employee" as used in the Dimensions policy by reference to the Staffing Agreement between the Agency and the Hospital. Because the Staffing Agreement provides that Agency practitioners will be treated as the employees of the Agency, not the Hospital, Dimensions contends that Nurse Cryer does not qualify as an "employee" under the Policy.

Dimensions' argument in this regard centers on Nurse Cryer's status as a "borrowed" employee. Borrowed employees have two employers -- a "general" employer, who essentially loans the employee to a borrowing or "special" employer. See Lovelace v. Anderson, 785 A.2d 726, 741 (Md. 2001) (noting "the settled principle of Maryland law that a worker may simultaneously be the employee of two employers" (internal

15

quotation marks and alteration omitted)); Temp. Staffing, 765 A.2d at 603 n.1 ("A general employer is an employer who transfers an employee to another employer for a limited period. A special employer is an employer who has borrowed an employee for a limited period and has temporary responsibility and control over the employee's work."). In this case, the Agency is Nurse Cryer's general employer, and the Hospital is her special employer. See id. ("A temporary employment company is a general employer and the company to which an employee is assigned is a special employer.").

As between the general and special employee, liability for the employee's act (or for the employee's worker's compensation claim) turns on whose work is being done and who can control that work:

> [W]here the work to be done is the borrower's work, and a part of his business, and he has the power and authority to direct when and where and how it shall be done, and where the work is not within the scope of the general employment of the servant, it may fairly be said that so far as that work is concerned he is under the control of the borrower and that the latter will be responsible for his negligent acts.

Dippel v. Juliano, 137 A. 514, 517 (Md. 1927); see Standard Oil Co. v. Anderson, 212 U.S. 215, 220 (1909) ("One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred . . . to the service of a third person, so that he becomes the servant of that person,

16

with all the legal consequences of the new relation."). However, if the general employer and special employer have entered into a contract assigning liability to one of the parties, courts will give effect to that contract. See Temp. Staffing, 765 A.2d at 611 (directing workers' compensation commission to consider contract between co-employers when assigning liability for benefits for injured employee); Hercules Powder Co. v. Harry T. Campbell Sons Co., 144 A. 510, 518 (Md. 1929) (reversing jury verdict in favor of special employer where contract between general and special employer assigned liability for employee's negligence to special employer); see also Sea Land Indus., Inc. v. Gen. Ship Repair Corp., 530 F. Supp. 550, 563 (D. Md. 1982) ("[U]nder Maryland law, whatever the status of an employee under the 'borrowed servant' doctrine, the parties may allocate between themselves the risk of any loss resulting from the employee's negligent acts.").

It is on the latter point that Dimensions pegs its argument. In Dimensions' view, a contract between a special employer and general employer assigning liability for the borrowed employee is determinative of the "who is an employee?" question, wherever that question might arise. See Brief of Appellee at 4 (stating that the Staffing Agreement "should apply to any borrowed servant analysis whether it is made in the context of a lawsuit between the borrowing and lending employer

17

or any other entities"). Pointing to cases such as <u>NVR, Inc. v. Just Temps, Inc.</u>, 31 F. App'x 805 (4th Cir. 2002) (per curiam) (unpublished), Dimensions argues that the Staffing Agreement "controls the employee's status," Brief of Appellee at 19, which makes the right-to-control or borrowed-servant analysis "irrelevant," <u>id.</u> at 17. And because the Staffing Agreement provides that Nurse Cryer is the Agency's employee and that the Agency will be liable for her negligent acts, Dimensions contends that Nurse Cryer is not a Hospital employee under the Policy. We disagree.

The cases on which Dimensions relies establish simply that the existence of a liability-assigning contract makes it unnecessary to apply the right-to-control test <u>in a dispute between the parties to that contract</u>. See <u>NVR</u>, 31 F. App'x at 807 ("Under Maryland law, <u>in cases like this one between a general employer and a borrowing employer</u>, . . . the parties may allocate <u>between themselves</u> the risk of any loss resulting from the employee's negligent acts." (internal quotation marks omitted; emphasis added)); <u>Sea Land</u>, 530 F. Supp. at 563 ("[W]hatever the status of an employee under the 'borrowed servant' doctrine, <u>the parties may allocate between themselves</u> the risk of any loss resulting from the employee's negligent acts." (emphasis added)). Nothing in these cases supports Dimensions' assertion that the terms of the Staffing Agreement,

a contract to which neither Dimensions, Interstate, nor Nurse Cryer were parties, determine the scope of the entirely separate insurance contract issued by Dimensions to the Hospital or diminish the protection provided to Cryer by the Policy. See Mayor of Baltimore ex rel. Lehigh Structural Steel Co. v. Maryland Cas. Co., 190 A. 250, 253 (Md. 1937) ("It seems axiomatic that persons are only bound by the contracts they make, and are not bound by contracts they do not make. . . .").

Accepting Dimensions' argument that the Staffing Agreement controls the meaning of the Policy would be inconsistent with Maryland principles of contract interpretation. As we have concluded, the Policy is not ambiguous, despite its failure to define "employee." Maryland law therefore requires us to look only to the Policy itself and to interpret it as written. See 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co., 60 A.3d 1, 22 (Md. 2013) ("[O]ur search to determine the meaning of the contract is focused on the four corners of the agreement. When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used. . . ." (internal quotation marks, citation, and internal alteration omitted)); Ray v. State, ___ A.3d ___, 2016 WL 5462963, at *15 (Md. Ct. Spec. App. Sept. 29, 2016) ("[E]xtrinsic sources of evidence that may be helpful in resolving an ambiguity, when it actually

19

exists, may not be used to create an ambiguity in the first instance."). Dimensions, however, contends we should look beyond the Policy and define its unambiguous terms not in accordance with their ordinary meaning, but in accordance with the terms of a wholly separate and independent contract. Because that argument is inconsistent with Maryland law, we are obliged to reject it.

The common, ordinary meaning of "employee" incorporates the right-to-control test -- that is, one who works in the service of another who has the right to control the details of the work is the employee of the entity with the right to control. By arguing that the Staffing Agreement controls the "employee" question, Dimensions is, in effect, arguing that the common, ordinary meaning of "employee" includes a footnote that carves out those workers who would otherwise qualify as employees but are the subject of a contract placing liability for them on someone other than the entity with the right to control. We disagree. As Maryland courts have made clear, "the words of insurance contracts [must be given] their customary, ordinary, and accepted meaning, as determined by the fictional 'reasonably prudent lay person.'" Connors, 113 A.3d at 603 (emphasis added). Lay persons do not generally footnote their words, and we decline to append Dimension's proposed footnote to the common meaning of "employee." Whether or not liability for the

20

employee has been assigned by contract between co-employers, the common, ordinary meaning of "employee" is one who works in the service of and subject to the direction and control of another.[*]

In addition to being inconsistent with Maryland principles of contract interpretation, Dimensions' claim that the Staffing Agreement controls is also largely foreclosed by this court's decision in Travelers Property and Casualty Co. v. Liberty Mutual Insurance Co., 444 F.3d 217 (4th Cir. 2006). In Travelers, State Street Bank hired Ryland Mortgage Company to service and manage mortgage loans held by State Street and to manage any properties State Street took over through foreclosure. By contract, Ryland was obligated to indemnify State Street for any claims arising from Ryland's management of the loans and property. A visitor to a foreclosed property was

_____

[*] Although we may not look to extrinsic evidence to determine the meaning of unambiguous language contained in an insurance policy, we must look to the actual facts of the case to determine whether they are sufficient to trigger the coverage provided by the policy. That is, while we may not consider the Staffing Agreement when determining the meaning of the term "employee" under the Policy, we must look to the facts established through discovery to determine whether Nurse Cryer qualifies as an "employee" as we have defined it. As to that question, the level of control given to the Hospital through the Staffing Agreement is a relevant and proper consideration. See, e.g., Interstate Fire & Cas. Co. v. Washington Hosp. Ctr. Corp., 758 F.3d 378, 384 (D.C. Cir. 2014) (concluding that "employee" was unambiguous term encompassing the right-to-control test and then considering contractual level of control to determine whether nurse qualified as an employee under the right-to-control test).

21

injured and sued State Street and Ryland.  Ryland was insured by Travelers, and State Street was insured by Liberty Mutual. Travelers provided a defense to Ryland and subsequently sought contribution from Liberty Mutual, arguing that Ryland was an additional insured under the policy issued to State Street.

On appeal, we agreed with Travelers that Ryland was covered by the Liberty Mutual policy.  The Liberty Mutual policy included State Street's "real estate managers" as additional insureds, and Ryland's contractual duties qualified it as a real estate manager.  See id. at 221-22.  Liberty Mutual, therefore, had an "independent contractual obligation to provide coverage to Ryland."  Id. at 219.  And because Liberty Mutual had an independent duty to provide coverage to Ryland, the indemnification agreement between Ryland and State Street was irrelevant:

> The issue here is coverage for only Ryland's liability.  Travelers concededly insured Ryland, and because of Liberty Mutual's insuring language, it must also insure Ryland through its additional insureds clause.  This is not a case where we are determining State Street's liability vis-à-vis Ryland's. The fact that Ryland agreed to indemnify State Street under the Pooling Agreement does not absolve Liberty Mutual of its independent contractual obligation to insure Ryland as State Street's "real estate manager."  If the issue in this case turned on the underlying liability as between Ryland and State Street, we would likely conclude, as Liberty Mutual urges, that Ryland bore full responsibility because of its indemnification agreement.  But even then, having determined that Ryland had legal responsibility for [the injuries to the property-visiting plaintiff], we

22

would still have to determine who insured that liability. In this case Travelers concededly provided coverage, as it issued a policy directly to Ryland as the named insured. But Liberty Mutual, which issued a policy to State Street as its named insured, also provided coverage to additional insureds, not because of any indemnity clause running in favor of its insured State Street but because of its independent undertaking to Ryland.

Thus, because we are deciding coverage for only Ryland's liability to [the property-visiting plaintiff], the indemnification agreement is irrelevant.

Id. at 224-25 (emphasis added).

As in Travelers, this case involves only the question of coverage for Nurse Cryer under the policy issued by Dimensions. The Agency and the Hospital are not parties to this action, and there is no issue before this court regarding indemnification or liability as between the Hospital and the Agency. It may well be that the primary purpose of the Dimensions policy was to provide insurance coverage for the Hospital and its direct-hire employees. Nonetheless, the policy that Dimensions chose to issue used language whose ordinary meaning includes Agency-provided employees as additional insureds. See United Servs. Auto. Ass'n v. Riley, 899 A.2d 819, 833 (Md. 2006) ("Courts in Maryland follow the law of objective interpretation of contracts, giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean." (internal quotation marks omitted)).

23

Thus, whether or not the Hospital intended to provide insurance for Agency-provided employees, Dimensions, by virtue of the policy that it issued, has an "independent obligation to insure [Cryer] as an additional insured." Travelers, 444 F.3d at 224. And as we made clear in Travelers, the contract between the Hospital and the Agency simply has no impact on Dimension's independent obligation to provide the coverage undertaken in the policy. See id. at 224-25.

Therefore, for the reasons set out above, we conclude that Nurse Cryer qualifies as an "employee" of the Hospital under the unambiguous language of the Policy, notwithstanding the contrary language of the Staffing Agreement.

B.

Dimensions also contends that the Policy's "affiliated health care provider" ("Affiliated Provider") clause operates to exclude Nurse Cryer from coverage under the Policy.

The professional-liability section of the Policy extends protected-person status (and therefore coverage) to "affiliated health care providers" under certain circumstances. Under the Policy,

> An Affiliated Health Care Provider means any natural person or organization [1] in the business of rendering health care services directly to the general public, and [2] who or which has an agreement to provide such services in conjunction with those provided by [the Hospital]. Affiliated Health Care Providers are included as Protected Persons only when

24

> [3] a written partnership or physician affiliation agreement specifically designates the Affiliated Health Care Provider[] as a Named Protected Person under this Agreement. Agencies providing clinical and other services on a per diem or contracted basis are not protected persons under this agreement.

J.A. 133.

Dimensions contends that Nurse Cryer meets the definitional requirements of the Affiliated Provider clause under the Policy. According to Dimensions, Nurse Cryer provides medical care directly to the public, thus satisfying the first Affiliated Provider requirement. And Nurse Cryer was providing those medical services at the Hospital through a contract with the Agency, thus satisfying the second Affiliated Provider requirement. Dimensions therefore contends that Nurse Cryer qualifies as an Affiliated Provider. An Affiliated Provider is a Protected Party, however, only if the third requirement is satisfied -- there must be a contract expressly designating the Provider as protected. Because there is no such contract in this case, Dimensions contends that Nurse Cryer is an Affiliated Provider who is not a Protected Person under the Policy.

In our view, the Affiliated Provider clause cannot carry the meaning assigned to it by Dimensions. If Dimensions' reading of the clause were correct, then all of the Hospital's medical-care-providing employees, whether direct-hire or contract, would qualify as Affiliated Providers. If Nurse Cryer

25

is "in the business of rendering health care services directly to the general public," J.A. 133, then so are direct-hire nurses and direct-hire or contract doctors. And if Nurse Cryer's contract with the Agency, or any implied contractual agreement she might have had with the Hospital itself, satisfies the requirement for an "agreement to provide [health care] services in conjunction with those provided by [the Hospital]," J.A. 133, then the contracts between the Hospital and its direct-hire care-providing employees would satisfy the requirement as well.

Thus, under Dimensions' argument, all of the Hospital's care-providing employees, whether contract or direct-hire, would qualify as Affiliated Providers. All of those employees would be precluded from Protected Person status (and therefore not insured under the Policy) for the same reason that Dimensions contends Nurse Cryer is not protected -- the absence of a "written . . . agreement specifically designat[ing] the Affiliated Health Care Provider[] as a Named Protected Person under this Agreement." J.A. 133.

The "Worker Protection" clause contained in the hospital-liability section of the Policy explicitly extends Protected Person status to the Hospital's "present and former employees, students and authorized volunteer workers," J.A. 134, without conditioning that status on the existence of a separate contract designating them as protected. Because Dimensions' reading of

26

the Affiliated Provider clause would render illusory the coverage provided by the "Worker Protection" clause, we must reject it. See Cochran v. Norkunas, 919 A.2d 700, 710 (Md. 2007) ("[A] contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." (emphasis added and internal quotation marks omitted)); Kelley Constr. Co. v. Washington Suburban Sanitary Comm'n, 230 A.2d 672, 676 (Md. 1967) ("[T]he courts will prefer a construction which will make the contract effective rather than one which will make it illusory or unenforceable." (internal quotation marks omitted)). Instead, we must read the Affiliate Provider clause in a way that preserves the coverage provided in the Worker Protection clause. See Rigby, 123 A.3d at 597 (explaining that courts should "give effect to each clause of an insurance policy, and avoid treating either term as surplusage" (internal quotation marks and citation omitted)).

As quoted above, the Policy defines Affiliated Provider as a "natural person or organization in the business of rendering health care services directly to the general public, and who or which has an agreement to provide such services in conjunction with those provided by [the Hospital]." J.A. 133. The phrase

27

"in conjunction with" means "in combination with" or "together with," see www.Merriam-Webster.com (saved as ECF opinion attachment), which demonstrates that the clause contemplates the provision of health care services in addition to those services already being provided by the Hospital. Thus, the clause is directed to entities that provide medical services to the public independently of the Hospital and agree to provide those services together with the services provided by the Hospital. (For example, a medical specialist with an independent practice who agrees to affiliate with the Hospital would qualify as an Affiliated Provider.)

So understood, it is clear that Hospital employees (whether contract or direct-hire) do not qualify as Affiliated Providers. The Hospital provides its medical services through its workers, be they contract or direct-hire. The workers do not provide medical services directly to the public, but only to the Hospital's patients, and only on the terms dictated by the Hospital. Hospital workers thus are not providing health care services in addition to or alongside the health care services provided by the Hospital; they are the ones providing the Hospital's health care services in the first instance. Because the Hospital cannot act in concert with itself, a Hospital worker cannot be said to be providing health care services "in

28

conjunction with" the Hospital, as the Policy requires to qualify as an Affiliated Provider.

That the Affiliated Provider clause is directed to independent entities rather than Hospital workers is confirmed by the clause's requirement of "a written <u>partnership</u> or <u>physician affiliation</u> agreement" designating the Affiliated Provider as a named insured under the Policy. J.A. 133 (emphasis added). This language describes the kind of contract that the Hospital would enter into with an independently operating medical business, not with its employees.

Accordingly, we conclude that Hospital workers, whether contract or direct hire, do not meet the definitional requirements of an Affiliated Provider under the terms of the Policy. We therefore reject Dimensions' claim that the Affiliated Provider clause operates to preclude coverage under the Policy for Nurse Cryer.

IV.

To summarize, we conclude that the term "employee" as used in the Dimensions Policy is not ambiguous and that it includes those workers who qualify as employees under the right-to-control test. Dimensions therefore has an independent obligation to provide coverage to those workers who meet the definition of "employee," without regard to how those workers may be classified under the Staffing Agreement executed by the

29

Hospital and the Agency.  Because the evidence contained in the record establishes that Nurse Cryer is the Hospital's employee under the right-to-control and the borrowed-servant standards, she is a "protected person" who qualifies for coverage under the professional-liability portion of the Dimensions Policy.

We therefore vacate the district court's opinion granting summary judgment in favor of Dimensions, and we remand for further proceedings consistent with this opinion.

<u>VACATED AND REMANDED</u>